*Decisions will be entered under Rule 50.*

ESTATE OF OEI TJONG SWAN, OEI ING TJHING, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 44690. Filed August 3, 1955.

830

*Harry J. Rudick*, *Esq.*, and *Mason G. Kassel*, *Esq.*, for the petitioner.
*Ellyne E. Strickland*, *Esq.*, and *Arthur L. Nims*, *Esq.*, for the respondent.

834

838

844

## OPINION.

FISHER, *Judge:*

### *Issue I.*

#### A.

The principal issue presented is whether the value of the assets of the Yan and Kien Stiftungs is includible in the decedent's gross estate for Federal estate tax purposes as determined by the respondent.

Section 811 (d) requires that there be included in the gross estate for Federal estate tax purposes the value of any property transferred by the decedent (except in case of a bona fide sale for an adequate and

full consideration in money or money's worth) "by trust or otherwise," where the decedent up to the date of his death retained the power "to alter, amend, revoke or terminate." Property of a nonresident alien decedent subject to such a transfer is deemed to be situated in the United States for Federal estate tax purposes if the property was so situated either at the time of the transfer or at the time of the decedent's death. Sec. 862 (b).

Petitioner contends that the United States assets of the Stiftungs are not includible in the decedent's gross estate on the theory that the Stiftungs must be considered foreign corporations, and the instruments representing the decedent's interest in the Stiftungs (the articles of foundation) were at the date of the decedent's death physically situated outside the United States. Petitioner argues that although stock was not issued by the Stiftungs, such an unincorporated entity should be treated as a foreign corporation and the instrument of organization (the articles of foundation) received by the decedent should be considered as stock. Thus, petitioner argues that the transfers of decedent's property to the Stiftungs would have been for a valuable consideration and without the scope of sections 811 (d) or 862 (b).

The two Stiftungs in question were organized by the decedent in 1939 for the purpose of providing funds for the benefit of his descendants. On July 23, 1943, the date of the decedent's death, the Yan Stiftung in Vaduz was a legal entity of and governed by the laws of the Principality of Liechtenstein and the Kien Stiftung in Chur was a legal entity of and governed by the laws of Switzerland. On that date the Yan Stiftung had on deposit in New York with the Guaranty Trust Company a cash balance of $1,039,072.20 and it also owned United States securities having a fair market value of $543,772.26, which were held by Guaranty in a custody account. The Kien Stiftung had on deposit in New York with the New York Trust Company a cash balance of $648,884.98 and it also owned securities having a fair market value of $192,131.25, which were held by New York Trust in a custody account.

The articles of foundation of the Yan Stiftung in Vaduz (originally organized as Yan Stiftung in Zug) provide that it may have a perpetual existence and that its purpose is the management of the Foundation fund and the use of such fund to the best interests of the descendants of the founder. Investments may be made by the board of the Foundation, composed of several members, in the form of corporate stocks, bonds, mortgage bonds, purchase of realty, the granting of loans secured by first mortgages, or it may "invest the fund in a manner different" from the stated powers. The first board of the Foundation was to consist of the founder as chairman and one or several other members appointed by him. As long as the founder

lived, he alone was to have the right of appointment and discharge of the board and after his death or legal incompetence, this right was to devolve on the Family Council. The board of the Foundation was entrusted with the legal representation of the Foundation and with its management. It could not, however, borrow any money without the approval of the Family Council and it could not commit the Foundation as guarantor or surety. It was accountable to the Family Council for its management and for all acts which it undertook in the name of the Foundation. The Family Council was to consist of the legitimate descendants of the founder, registered as such in the Register of Descendants, who have attained their 25th year. The number of members of the Family Council was not to exceed 30. The Family Council was to hold annual meetings at the office of the Foundation and to "exercise all functions which are vested in the highest agency of an artificial person by the law."

The articles also provided that 10 per cent of the Foundation's annual net profits should be allocated to a "Reserve Fund A" which was to be used to cover balance sheet losses and unrealized losses such as declines in the value of assets. Whenever this fund was not sufficient to cover such loans, the balance of the Foundation's annual income was to be paid to a "Reserve Fund B" to the extent of "the amount of the fund loss" appearing in the balance sheet. If it were unnecessary to allocate any part of the Foundation's annual net profits to Fund B, 75 per cent of such profits were to be paid to the founder's descendants and the balance of 15 per cent could be used by the board of the Foundation for general purposes or for gifts or contributions. The portion of the Foundation's annual net profits intended for distribution for the founder's descendants was to devolve, share and share alike, upon the children of the founder. In the event of the death of a child, the latter's legitimate children who were registered in the Register of Descendants were to take his place and his share was to be distributed equally among such children. The same principle was to apply in the event of the death of any descendant for each further degree of descent. Beneficiaries could not assign their shares or payments and could not be deprived of such payment by their creditors. Upon the death of the last legitimate descendant of the founder, the Foundation's annual profits were to be used for promoting and encouraging the Arts and Sciences, for the care and treatment of the sick and infirm, for the care of the poor, and for fellowships and scholarships, with the further proviso, however, that 60 per cent of such profits should be paid out in China and 15 per cent in the Netherlands Indies.

The articles of foundation of the Kien Stiftung are substantially similar to the articles of foundation of the Yan Stiftung except that

the Kien Stiftung was created for the benefit of Djie Swan Nio and her descendants.

Under Swiss and Liechtenstein law, a Stiftung is a legal entity created by dedication of property for a specific purpose which can be of a public, charitable, or private character and, being a legal entity, is subject to separate taxation in both Switzerland and Liechtenstein. The concept of trust ownership in the legal sense in effect in the United States is not recognized under Swiss or Liechtenstein law.

The precise nature of the foreign Stiftung for United States tax purposes, and in particular for Federal estate tax purposes, has not been determined. In a number of respects, the Yan and Kien Stiftungs closely resemble a corporation. For example, like a corporation, the Stiftungs have perpetual existence; they are managed by a board which is analogous to a board of directors; the board may be changed by decision of the Family Council in somewhat the same way as stockholders may change the board of directors of a corporation; they continue regardless of the death of beneficiaries; there is no personal liability on beneficiaries for the acts of the Stiftungs; and the foundations may engage in business activities. Moreover, the Stiftungs have articles (and bylaws) comparable to certificates of incorporation (and corporate bylaws); they are treated as separate juridical entities; they may sue and be sued in their own names; and they are taxed on their own capital and income. On the other hand, there are no certificates of interest such as shares of stock as in the case of the usual corporation; the interests of the beneficiaries are nontransferable; the articles have characteristics which are similar in many respects to a deed of trust; and provision can be made as in the case of a trust for changing the trustees.

However, the features above referred to appear to us to be largely the general formal characteristics of the Stiftungs as organizational entities, which, considered alone, are not a sufficient basis for categorization for every tax purpose as petitioner appears to contend. For estate tax purposes, we think that the most significant features of these Stiftungs are other than the characteristics of their formal organization as Swiss entities. The decedent caused the Stiftungs to be created as family foundations for the purpose of providing funds for the care and education of members of his family; at all times up to the date of his death the decedent had the power to amend the articles of the Foundation and to revoke the Stiftungs; and the Stiftungs did not engage in business.

These features we think give the decedent such power to control the enjoyment of the property of the Stiftungs as was contemplated by the broad scope of section 811 (d). That the purpose of the section was to prevent avoidance of estate tax by valid inter vivos transfers

of property while retaining the important element of control over ultimate enjoyment of that property up to the date of death is evident. And it is this element of control which is decisive in determining the applicability of the section, regardless of the form of the transfer or the manner in which it is made. We would hardly assume that all of the possible means of conveying property while retaining control over enjoyment have been devised or are even presently predictable, although the most common form for such transfers is by trust. Section 811 (d), however, is not limited in its application to any one particular or few well recognized means of so transferring property and covers broadly in the terms of the statute such transfers "by trust or otherwise." We think, therefore, that regardless of the precise nature of the Stiftung, transfers such as involved in the instant case are subject to the provisions of section 811 (d).

We do not think that these transfers are excepted from the purview of that section as bona fide sales for adequate and full consideration in money or money's worth. Decedent transferred the assets to the Stiftungs gratuitously in essentially the same manner as would have been followed if he were to have made such a transfer to a trust in this country. It is conceded that the decedent did not receive stock or like certificates for the transfer, and we do not think the articles of foundation may stand in lieu thereof. It is by virtue of these very articles that the decedent retained the powers which bring the transfers within the purview of section 811 (d). It would be wholly anomalous to consider the articles establishing the Stiftungs and reserving to the decedent the powers normally leading to taxation under section 811 (d) as full and adequate consideration for the transfers.

We think the features described above give the Stiftungs a character which both in purpose and function very closely resembles the private trust which is organized and used solely for a family purpose. See 1 Nossaman, Trust Administration and Taxation (1945), page 2, where in referring to the traditional type of trust (those created for other than business reasons) it is stated that "the principal purposes which motivate its creation are * * * the management of the property * * * its conservation * * * protection of beneficiaries * * *." See also, 1 Scott, Trusts (1939), sec. 2, pp. 30–42, generally on the nature of the trust. We think that the difference between the trust as we conceive it and these particular Stiftungs is merely one of formal organization under differing legal systems.

The civil law does not recognize the trust as we know it, and we do not have in our law an identical institution such as the Stiftung (though in the area of charitable foundations the relationship between Swiss, Liechtenstein, and American law is probably closer). However, it is clear that the uniqueness of the trust as a juridical

institution of the Anglo-American system of law is not a consequence of the situations to which it applies. Quite to the contrary, the underlying factual complex is not peculiar, and different devices have been developed in other legal systems to meet the needs of these situations. In fact, it has been stated that "[often] there is a striking similarity between the juridical devices employed." 1 Scott, Trusts (1939), p. 26. See also, Lepaulle, "Civil Law Substitutes for Trusts," 36 Yale L. J. 1126 (1927) ; Nussbaum, "Sociological and Comparative Aspects of the Trust," 38 Col. L. Rev. 408 (1938). We are, therefore, faced with the serious difficulty of translating a foreign law concept into our own terms. For tax purposes such a problem must be handled in a practical way. We think that for Federal estate tax purposes we must look to the essence of the foreign organization—its functional features—and treat it accordingly.

In view of our expression that we consider the particular Stiftungs involved in the instant case to be very much like a private trust, and in the absence of any compelling reason to the contrary, we think that the transfers of property by the decedent to the Stiftungs subject to the power of revocation should not be treated any differently than we would treat such transfers to a private trust. In fact, we think that it is relatively insignificant for Federal estate tax purposes that the decedent, a nonresident alien, carried out his purposes within the particular legal means and juridical concepts which were recognized in his own country (and which there have particular and definite legal effect), since it seems more important in resolving a problem such as the one before us to consider the method and technique that the decedent would have had to have employed in the United States in order to accomplish his basic purposes. We think that in the circumstances of this case it is evident that it would have been necessary to have established a trust.

Section 811 (d) is clearly broad enough in its terms to include the transfers here in issue. The Stiftungs, which for Federal estate tax purposes are to be treated as comparable to our private trust, obviously are encompassed by the broad statutory language "by trust or otherwise."

For the sake of completeness, petitioner's several arguments will be discussed briefly.

Petitioner cites Article II (1) (f) of the Income Tax Convention between the United States and Switzerland, signed on May 24, 1951, Treaty Series No. 2316 (1952), which is as follows:

(f) The term "Swiss enterprise" means an industrial or commercial enterprise or undertaking carried on in Switzerland by an individual resident in Switzerland or by a Swiss corporation or other entity; the term "Swiss corporation or other entity" means a corporation or institution or foundation [1] having

[1] In the Swiss German version of this treaty, the word "Stiftung" is found in place of the English word "foundation."

juridical personality, or a partnership (association "en nom collectif" or "en commandite"), or other association without juridical personality, created or organized under Swiss laws.

Petitioner argues that by treating the Stiftung in the same way as a corporation, the Convention definition supports his position that the Stiftungs here in issue should be treated as foreign corporations rather than more in the nature of revocable trusts, particularly since the Stiftung has juridical personality like a corporation as distinguished from partnerships and trusts.

We disagree, and think that it should be recognized that the classification of the Stiftung as a corporation for tax purposes under the Convention is only for the purpose of income taxation. (The United States Estate Tax Convention with Switzerland contains no reference to the Stiftung.) The objective of the definition is to specify those enterprises which may have taxable industrial and commercial profits (business income) under the Convention. We think that the inclusion of the Stiftung is obviously based on the fact that a Stiftung may engage in business and thus may have business income subject to tax in accordance with the terms of the Convention. Clearly such a Stiftung ought not to be treated differently than other commercial enterprises. But it is evident that the Convention classification assumes that the Stiftung is carrying on a business, whereas such is not the case in respect to the Yan and Kien Stiftungs. Thus, in the instant case, where the Stiftungs were not engaged in business, we think that for estate tax purposes they are to be treated as something in the nature of private trusts and subject to the terms of section 811 (d).

Petitioner also contends that even if it were considered that the Stiftungs were not corporate bodies under Swiss and Liechtenstein law, but merely associations or entities in some respects similar to a trust, for all purposes of United States tax law, each of the Stiftungs should be considered as an association taxable as a corporation under section 3739 (a) of the Internal Revenue Code, which provides that "the term 'corporation' includes associations, joint stock companies and insurance companies." We think it well established, as petitioner asserts, that whether a trust or an association is taxable as a corporation depends on the facts of each case. It is clear, however, that ultimately such classification must depend upon the nature of the activities carried on by the trust or association. In this connection, it was pointed out in *Morrissey* v. *Commissioner*, 296 U. S. 344 (1935), relied on by petitioner, that,

"Association" implies associates. It implies the entering into a joint enterprise, and, as the applicable regulation imports, an enterprise for the transaction of business. This is not the characteristic of an ordinary trust—whether created by will, deed, or declaration—by which particular property is conveyed to a trustee or is to be held by the settlor, on specified trusts, for the benefit of named or described persons. Such beneficiaries do not ordinarily, and as mere

cestuis que trust, plan a common effort or enter into a combination for the conduct of a business enterprise. Undoubtedly the terms of an association may make the taking or acquiring of shares or interests sufficient to constitute participation, and may leave the management, or even control of the enterprise, to designated persons. But the nature and purpose of the co-operative undertaking will differentiate it from an ordinary trust. In what are called "business trusts" the object is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains. * * *

The inclusion of associations with corporations implies resemblance; but it is resemblance and not identity. * * *

*   *   *   *   *   *   *

The suggestion ignores the postulate that we are considering those trusts which have the distinctive feature of being created to enable the participants to carry on a business and divide the gains which accrue from their common undertaking, trusts that thus satisfy the primary conception of association and have the attributes to which we have referred, distinguishing them from partnerships. In such a case, we think that these attributes make the trust sufficiently analogous to corporate organization to justify the conclusion that Congress intended that the income of the enterprise should be taxed in the same manner as that of corporations.

See also *William F. Buckley*, 22 T. C. 1312 (1954), cited by petitioner, where in determining the character of two organizations formed under the laws of Venezuela as "anonymous companies" we held that the organizations were corporations or in any event legal entities, in accordance with *Morrissey*. In pointing out that the organizations were not pure trusts for tax purposes (there is no concept of trusts in the Venezuelan law), we emphasized that the Venezuelan organizations were created and operated for business purposes, and the record clearly indicated that the activities of the organizations were of a business character. See *Moline Properties, Inc.* v. *Commissioner*, 319 U. S. 436 (1943).

Petitioner's last contention is that in *Oak Commercial Corporation*, 9 T. C. 947 (1947), affd. (C. A. 2, 1949) 172 F. 2d 896, it was conceded or assumed that the Aramo-Stiftung was taxable as a corporation. We think it needs only to be pointed out, as petitioner admits, that the question presented to the Court was not whether the Stiftung was taxable as a corporation or otherwise. The tacit assumption of the parties is obviously not binding on us.

### B.

Petitioner urges an alternative contention to the effect that the cash on deposit with the Guaranty Trust Company of New York and the New York Trust Company in the names of the Yan and Kien Stiftungs, respectively, constituted moneys on deposit for the decedent (a nonresident alien not engaged in business in the United States at the time of his death) within the meaning of section 863 (b) of the Internal Revenue Code, providing that "Any moneys deposited with any

person carrying on the banking business, by or for a nonresident not a citizen of the United States who was not engaged in business in the United States at the time of his death" shall be deemed property outside of the United States, which in the case of such a nonresident alien decedent is exempt from United States estate tax. It is argued, in effect, that the decedent so dominated and controlled both Stiftungs and treated the assets thereof as his own that the moneys held on account in the names of the Yan and Kien Stiftungs should be considered as on deposit for the decedent's own use and benefit, and accorded the same status under section 863 (b) as if they had also been in decedent's own name.

Respondent, on the other hand, argues that in fact the Stiftungs were not so controlled or the assets thereof so treated, and further, that the cash assets were owned and on deposit for the Stiftungs, which were independent juridical entities, and not the decedent. Accordingly, respondent contends that the exemption provided for in section 863 (b) is inapplicable. We agree with respondent for the reasons set out below.

Both the Yan and Kien Stiftungs were originally established by petitioner in 1939 in order to provide a fund which might be used by members of his family for education and support. The petitioner as founder was, during his lifetime, chairman of the board of each of these family foundations. Within the terms of the articles governing these foundations, the decedent was actually the sole manager of the Stiftungs and he had the power to amend the articles in any respect and to revoke the Stiftungs. The decedent was the only person authorized to withdraw the funds of the Stiftungs or to issue any instructions with respect to the accounts of the Stiftungs at the two New York banks. Withdrawals might be made and other instructions given on his signature alone. It appears that if the decedent had wished he might have withdrawn the entire amounts of cash held in the Stiftung accounts and deposited these to his own personal account either in the United States or abroad, subject only to foreign funds restrictions. Whether such an act would constitute a violation of decedent's duties as chairman of the board to carry out the stated purpose of the foundations, i. e., to use the assets "to the best interests of the descendants of the Founder," is not clear. However, it is clear that decedent could have accomplished this by amending or revoking the Stiftungs. On the other hand, no such transfer was made, and only on several occasions did the decedent withdraw small amounts for his own use. One transfer to his own account occurred prior to the establishment of the present Yan and Kien Stiftungs.

We do not think that these facts alone are sufficient to sustain petitioner's view of the decedent's relationship to the funds of the Yan and Kien Stiftungs. The decedent did not treat the assets of the two

Stiftungs as his own personal property. In fact, it is apparent from the record that the decedent actually considered the assets of the two Stiftungs as the separate assets of those foundations and, despite his ultimate control over the two Stiftungs, treated them during his lifetime as separate entities. The limited number of withdrawals from these two Stiftungs at a time when the decedent had shortly before transferred a substantial amount of his own personal funds to the Stiftungs is not sufficient to support petitioner's view.

It is our view that deposits made to the credit of separate entities for trust purposes are not to be deemed "moneys deposited * * * by or for a nonresident not a citizen of the United States * * *" within the meaning of section 863 (b), even though the nonresident furnished the funds so deposited and retained the unexercised power to revoke the instruments creating the entities or to withdraw any part or all of the funds for his own purposes and upon his own order.

Neither of the parties has called to our attention any decision which is clearly determinative of the issue, and we have found none. We find, however, that there are authorities which shed some light on the issue, and since the problem is not free from difficulty, we think it helpful to discuss them in some detail.

*City Bank Farmers Trust Co.* v. *Pedrick*, (C. A. 2, 1948) 168 F. 2d, 618, certiorari denied 335 U. S. 898, at least suggests that our view is correct. In that case, a nonresident alien created a trust for the benefit of himself and his wife. The trust property included a cash deposit in a New York bank. The trust was subject to revocation and amendment by the settlor with the consent in writing of the trustee. In urging the applicability of section 863 (b), it was argued that for practical purposes, the settlor had reserved an unconditional power to withdraw the deposit. In this connection, the court said (p. 619) :

The plaintiff's argument presupposes that the case is the same as though the settlor had reserved an unconditional power to withdraw the deposit from the trust whenever he chose. It argues that, although the trustee was a "department of the National City Bank, the deposit after its transfer by the settlor was no more than a debt owed to the trustee by the bank, precisely as it had been while the settlor himself was the depositor; and with all this we agree. It further argues that the transfer, whatever might otherwise have been its effect, when read with the power of revocation, affected the settlor's control over the deposit only in form. Although it then became necessary for him, as a preliminary to drawing a cheque on the account, to execute the document prescribed in the deed revoking the trust pro tanto, that did not clog his control; it merely added to the number of papers he must sign. We are not sure that § 863 (b) would exempt the deposit, even if the power were as absolute as this argument assumes. The purpose of the section was indeed to encourage the maintenance by aliens of bank deposits in our banks; but it is at least open to doubt whether the deposits intended were other than ordinary bank accounts subject to withdrawal by cheque, of which the public often speaks as "cash in bank" and regards much as it does currency. Contrary to the plaintiff's assertion, the section is a tax exemption; and it is idle to try to disguise its purpose by setting it

down as a regulation of the "situs"—that much abused word—of bank deposits. *As an exemption section we look at it jealously; and we wish to guard against the implication that, even if the reserved power had put the deposit unconditionally within the settlor's control, it would have been exempt.* [Emphasis supplied.]

In 1 Scott, Trusts (1939), page 225, we find, among others, the following statements:

A conveyance in trust is incomplete unless the settlor has passed the title to the property to the trustee by delivery of the subject matter of the trust or of an instrument of transfer. *On the other hand, if the conveyance in trust is completed by such delivery, the trust is not incomplete merely because the settlor reserves power to revoke or to alter the trust.* There is a sufficient surrender of control over the property if the settlor transfers the title to it to the trustee, even though he reserves power to undo what he has done. The surrender of control is sufficient even though the settlor reserves power to reassume control. [Emphasis supplied.]

In 4 Bogert, Trusts and Trustees (1951), sec. 994, page 442, the author says:

So likewise the settlor may by express provision vest in himself a power to revoke or cancel the trust at will, * * * Such a reservation of a power to revoke does not affect the validity of the trust. It merely makes the interests of the trustee and cestui defeasible at the desire of the settlor.

We make brief reference to *Estate of Fredericka Loewenstein*, 17 T. C. 60 (1951), cited as authority by respondent, in which we held that funds in the general bank account of a trust for the benefit of a nonresident alien were not excludible from the gross estate as bank deposits by or for a nonresident alien within the meaning of section 863 (b), Internal Revenue Code. Although it is consistent with our holding in the instant case, we do not consider it to be controlling, because the nonresident alien had no control over the trust or the funds on deposit.

Our consideration of authorities relied upon by petitioner demonstrates that they are distinguishable upon the facts. The following are illustrative:

In *Estate of Karl Weiss*, 6 T. C. 227 (1946), where a friend of the decedent had deposited money belonging to the decedent in an account in his own name and the name of his son, the respondent argued that such a deposit made by another was not "for the decedent" if the funds were not deposited to the credit of the decedent or in the decedent's name, and if there was not some direct contractual relationship between the decedent and the bank. We held that the question of whether or not moneys on deposit were *for* the decedent depended on whether the moneys so on deposit were "for the use and benefit of" or "upon behalf of" the decedent. We carefully pointed out in our Opinion that the friend "did not deposit the money for himself as a regularly constituted fiduciary or trustee."

In *Estate of Elizabeth Hawxhurst Davey*, 10 T. C. 515 (1948), moneys were on deposit with a New York bank in the name of that bank as trustee under a trust previously established by the decedent. Prior to the date of the decedent's death, she exercised her power to revoke the trust, forwarding appropriate papers to the bank, which, at the date of decedent's death, had not made a final distribution of funds then on deposit in its name as trustee. We held that the requirements of section 863 (b) had been satisfied and that the moneys on deposit in the name of the trustee were, within the meaning of that section, on deposit *for* the decedent. In the instant case, however, the power to revoke had not been exercised with respect to the funds of the Stiftungs on deposit at the time of decedent's death.

In *Estate of Anna Floto De Eissengarthen*, 10 T. C. 1277 (1948), moneys were on deposit in a New York bank in the name of decedent's testator. Under Swiss law, property of the testator became by force of law at the moment of death the property of the person appointed by his will as heir. Thus the decedent, upon the death of the testator, became the sole owner of the bank deposit in question even though it stood in the name of the testator. In those circumstances we held that the money was on deposit for the decedent's use and benefit within the meaning of section 863 (b). In the instant case, the Stiftungs were separate entities under the laws of Switzerland and Liechtenstein, and the funds on deposit were not vested in decedent at the time of his death.

In *Estate of Irene de Guebriant*, 14 T. C. 611 (1950), as in the *Davey* case, moneys previously subject to a trust were at the date of the decedent's death on deposit in a New York bank in the name of the trustee. The trust had terminated, however, and, as in the *Eissengarthen* case, the decedent was by force of law, immediately upon termination, entitled to one-half of the trust corpus, subject to settlement and accounting by the trustees in whom legal title to these assets was reposed. The bank was in the position of a mere liquidating trustee obliged only to settle the accounts and distribute the trust corpus. We held, in accordance with our previous decisions in *Weiss*, *Eissengarthen*, and *Davey*, that the moneys on deposit, despite the absence of a direct contractual relationship between decedent and the bank, and despite the fact that the deposit had not been made by the decedent and was not in the decedent's name, were nevertheless "for" the decedent within the meaning of that term in section 863 (b). The decedent had a direct enforceable claim against the trustees for one-half of the bank deposit, subject only to the formal requirements of accounting and distribution to be performed on behalf of the decedent by the trustees. We stated that "the decisive fact * * * is that the trust had terminated and the decedent had an unconditional right to the trust funds held on deposit." See also *Estate of Mertyn*

*S. Bradford-Martin*, 18 T. C. 544 (1952), decided on the authority of *Eissengarthen; Estate of Leslie Diana Worthington*, 18 T. C. 796 (1952) ; *Estate of Lena Joachim*, 22 T. C. 875 (1954).

We think that the principle which emerges from the foregoing discussion is that while section 863 (b) does not require that a deposit be made by the decedent or in the decedent's name, or that there be a contractual relationship between the decedent and the bank, but only that the deposit be actually owned by the decedent and be for the decedent's use and benefit, such ownership does not exist where funds are held in an existing active trust. We think the same principle is applicable in the instant case where the Stiftungs remained as active and separate entities on the date of the decedent's death.

*Estate of F. Herman Gade*, 10 T. C. 585 (1948), relied on by petitioner, is also distinguishable. Petitioner argues that "[s]ince the statute is apparently satisfied if the funds are on deposit with a bank and are 'subject to decedent's order', it is submitted that the cash on deposit in the Yan and Kien Stiftungs at the date of the decedent's death, being also subject to the decedent's order, is within Section 863 (b) of the Code."

In *Gade* the decedent and a bank had entered into an agreement entitled "Agency Agreement," in which decedent was designated as the "Owner" and the bank as the "Company." Under its terms, the bank was appointed "agent and custodian" for decedent of certain securities and investments which were delivered to it by decedent. The bank was to collect the income and principal on the securities and investments. The net income was to be distributed as follows: "Hold subject to owner's instructions." The precise question presented was whether moneys held by a banking institution, clearly for the use and benefit of the decedent, were moneys "on deposit" within the ordinary meaning of that term and within the meaning of the statute. Resolving the question in favor of the taxpayer we stated:

And if we reach beyond the surface language and seek out the objective at which the legislation was aimed, we likewise find that application of the exclusion to estates of persons in decedent's position is equally indicated. The legislative purpose, as manifested when the provision was adopted, was to place American banks in a competitive position with those abroad in their activities carried on for foreigners. S. Rept. 275, 67th Cong., 1st Sess., p. 25. Limiting application to the deposit of funds in conventional savings or checking accounts, and excluding the comparable relationship of cash in a custody or management account would fall far short of accomplishing this statutory objective. If foreign investors are deterred from placing funds in bank accounts by the fear that the property will be subjected to estate tax in the United States, the effect would presumably be similarly adverse in respect of funds subject to decedent's order but growing out of arrangements calling for custody or management.

Only by attributing to the word "deposit" a narrow and technical meaning, entirely at variance with the remaining language of the section and with its

declared spirit, is there ground for denying the claimed exclusion. Nothing in the authorities to which we have been referred appears to call for any such treatment.

There is no issue in this proceeding concerning whether the moneys held in custody account were "moneys on deposit" within the meaning of section 863 (b), which was the issue involved in *Gade*. The only issue here is whether or not these moneys were so on deposit *for* the decedent within the meaning of that section. The criteria selected in *Gade*, namely, whether funds were subject to decedent's order, was in recognition of practical realities to give substance to the concept "on deposit" and furnish no basis for determining whether moneys subject to the order of an individual were on deposit for that individual when they were in fact the property of separate entities, such as trusts, or, more specifically in the instant case the Stiftungs. See also *Estate of Annina Fabbricotti Fara Forni*, 47 B. T. A. 76 (1942).

A further contention of petitioner respecting the moneys on deposit in the name of the Kien Stiftung requires consideration. Petitioner argues that the Kien Stiftung was invalid under Swiss law from its very inception and, therefore, that its assets were in reality assets of the decedent, since under Swiss law it is as though no transfer had ever been made from the decedent to the Stiftung. Accordingly, petitioner argues, the moneys on deposit in the name of the Kien Stiftung were in fact on deposit for the decedent as owner and fall clearly within the exemption provided for by section 863 (b).

Both parties offered expert testimony as to the validity of the Kien Stiftung under Swiss law. Both experts agreed that the Stiftung was invalid because it provided for the general support of the beneficiary without limitation. Both agree that, to be valid, the provisions for the beneficiary must be limited to provisions for "education, endowment and assistance in case of need."

The expert witnesses disagreed, however, as to the nature and effect of such invalidity. Petitioner's expert expressed the view that the Kien Stiftung was invalid *ab initio* and that no formal action or proceeding was necessary to establish the fact that it was a nullity from its inception. Respondent's expert expressed the view that the Stiftung would be regarded as a de facto entity unless and until it was determined to be invalid by appropriate proceedings (in which event it would be declared invalid *ab initio* in such proceeding).

The burden of proof of applicable Swiss law was upon petitioner. We think he has failed to meet that burden insofar as it is here material. Both expert witnesses appeared to be intelligent and well-versed in Swiss law. No question of the veracity of either of them was raised. The record furnishes to the Court no standard by which their respective abilities may be significantly compared. Other fac-

tors, however, persuade that, if there is a preponderance of evidence on this issue, it is favorable to respondent's position.

Our examination of the Kien Stiftung indicates careful preparation by a skilled draftsman. It did in fact operate as a separate entity. It was formed for a clear and recognized purpose. Its founder conducted himself in a manner which evidenced recognition of its existence. The bank which handled its funds in New York recognized its existence. There is no evidence that its existence was ever questioned by anyone prior to the emerging of the present issue in relation to the applicability of the Federal estate tax. There is no evidence that any proceeding (whether technically required or merely for the practical purpose of removing all doubts) was ever instituted or prosecuted to a conclusion to establish its invalidity, and if invalid whether such invalidity rendered it void *ab initio*. In sum, there is nothing in the record which suggests that anyone deemed the Kien Stiftung a nullity or denied at least its de facto existence as a separate entity at the time of, prior to, or subsequent to decedent's death except in relation to the present issue.

Under the circumstances, we hold that petitioner has failed to establish by a preponderance of the evidence that the Kien Stiftung was a nullity or that the funds on deposit for its account in New York at the time of decedent's death were the property of the decedent on the theory that the Kien Stiftung had no legal existence.

Petitioner presents a further contention to the effect that the portion of the moneys transferred by the decedent to the two Stiftung accounts shortly after the war began was money on deposit for him within the meaning of section 863 (b). Petitioner argues that this transfer by the decedent was merely transitory and was made only for the purpose of safekeeping the funds. At that time the decedent was in Vichy, France, and was endeavoring to obtain permission from the French and German authorities to return to Holland to his family who were then living in occupied territory. The decedent was undoubtedly afraid that the Germans might force him to transfer his property to them or that they might issue a vesting order transferring the property of all Dutch nationals to the German state. To avoid such happenings, the decedent requested the New York banks to transfer moneys then in his own personal accounts to the accounts of the Yan and Kien Stiftungs. Petitioner contends that this transfer was for such a limited purpose that the moneys were in reality being held on deposit for the benefit and use of the decedent within the meaning of section 863 (b).

We hold that the record fails to establish petitioner's contention. There is nothing in the record which demonstrates that decedent intended to make only a temporary transfer of his personal funds to the accounts of the Stiftungs. His letters in evidence indicate only that

a transfer was to be made, and other evidence indicates only that one purpose for which these transfers were probably made was to prevent any of the funds being forced through the hands of the decedent into those of the German army of occupation. These circumstances, however, do not preclude the possibility that the petitioner might have intended to make a permanent transfer of funds from his own account to the Stiftungs for the use of the Stiftungs in carrying out their function. Upon the state of the record, we do not think that petitioner has established what decedent's intention was in making the transfers, and we therefore find no basis for upsetting the respondent's determination.

*Estate of Karl Weiss, supra,* and *Marguerite F. Schwarzenbach,* 4 T. C. 179 (1944), cited by petitioner, are distinguishable on their facts. In *Weiss* the decedent had died in a German concentration camp in 1941. Prior to this, however, his partner and friend had succeeded in emigrating to the United States bringing with him some money which belonged to the decedent. The money was deposited in the partner's name and that of his son for the benefit of the decedent in order to safeguard it against German confiscation. In holding that the money so on deposit was exempt from estate tax under section 863 (b) of the Code, we recognized the obvious and well-established fact that the money in question was being held by the partner for the use and benefit of the decedent. No such fact has been established in the instant case with respect to the money transferred by the decedent to the Stiftungs.

In *Schwarzenbach,* which involved a question of gift tax, the taxpayer, a resident of Switzerland, created a trust in 1940, the purpose of which was to prevent confiscation of her property by Germany in the event of the invasion of Switzerland. Under the trust indenture, the taxpayer reserved a power of revocation subject to the unanimous consent of the trustees, one of whom was a beneficiary of the remainder interest. The trustees, however, had agreed to give their consent to revocation after the emergency had passed. The Court held that there was no transfer subject to gift tax for the reason that the taxpayer did not have the "clear and unmistakable intention * * * to absolutely and irrevocably divest * * * [herself] of the title, dominion and control of the subject matter of the gift * * *." The Court also held that the taxpayer "did not lose control of her 'gift' nor did the trustees have possession of it free from a duty to return it to her after the accomplishment of the limited purpose for which the trust was created."

We think that, unlike the instant case, it was clearly established in *Schwarzenbach* that the taxpayer was making a temporary transfer for a limited purpose.

## C.

Another argument advanced by petitioner is that the value of those assets constituting property within the United States for estate tax purposes, held by the Stiftungs and by the decedent personally, may not be included in the gross estate since title to and ownership of the assets vested in the State of the Netherlands, as represented by the government in exile in London, under a decree, issued on May 24, 1940. Petitioner argues that the United States Government officially recognizes and gives such effect to the decree.

Respondent, on the other hand, contends that assets belonging to the Stiftungs were not subject to the Dutch decree, and further, with respect to assets belonging to the decedent and subject to the decree, that recognition and effect are accorded the decree only to the extent that so doing is not against public policy. Respondent urges that no effect may be given to the decree which would preclude the United States Government from enforcing valid rights against assets located in the United States but belonging to Dutch nationals and residents, or from taxing such assets as though title had not been vested in the Netherlands Government.

With respect to the assets of the Yan and Kien Stiftungs, petitioner appears to assume in his argument that if we determine that the Stiftungs are to be treated essentially in the same manner as revocable trusts for estate tax purposes, we must treat such assets for all purposes as if they were in fact owned individually by decedent. It is evident from our discussion of Issue I, B, that we do not so hold, and we think it unnecessary to repeat our reasons at this point.

Construction of the Netherlands decree is a judicial problem. See *Anderson* v. *N. V. Transadine Handelmaatschappij*, 289 N. Y. 9 (1942), in which it was said that the "scope and the effect within this state of a decree promulgated by the recognized government are judicial questions, just as the scope and effect of the law of any long-established and recognized friendly foreign government * * *." It is our view that the decree purports only to vest in the Netherlands Government title to claims which belong to natural or legal persons domiciled in the Netherlands. The Stiftungs were not Dutch legal entities and therefore were not subject to the Netherlands decree. The decedent, however, was domiciled in Holland, but we think it is clear that he had no "claim" against the assets of the Stiftungs within the meaning of the decree. It is recognized by both parties that neither the decedent nor his creditors could effectively assert any claim against these assets (except perhaps if the Kien Stiftung were to be deemed a nullity, considered hereinbefore, or if a portion of the cash on deposit for the Stiftungs had been transferred by the decedent only for safekeeping, likewise considered hereinbefore). We hold, there-

fore, that the decree did not operate to vest title to the assets of the Stiftungs in the Netherlands, since the decedent was possessed of nothing which could so vest within the terms of the decree. In this connection, we point out that the decedent's unexercised power to amend or revoke the Stiftungs was not a "claim" to the assets of the Stiftungs. Any "claim" thereto which might be encumbered, pledged, transferred, or sold, within the meaning of the decree, could arise only upon exercise of that power. Even if we agreed with petitioner's assumption that the assets of the Stiftungs were in fact assets of the decedent, it is our view (for reasons hereinafter set forth with respect to assets admittedly owned by decedent) that the assets held by the Stiftungs would not be relieved from Federal estate taxes by virtue of the decree.

At the date of his death, decedent owned certain securities (see Issue II, *infra*), title to which was, we think, subject to being divested under the Netherlands decree. See *State of The Netherlands* v. *Federal Reserve Bank*, (C. A. 2, 1953) 201 F. 2d 455, reversing in this respect 99 F. Supp. 655. We must therefore consider the effect for the purposes of this case to be given to that decree as an act of the Netherlands Government in Exile, which the United States recognized as the legitimate Dutch Government. Respondent contends that the decree cannot be given any effect which will limit the right of the United States to impose and collect taxes on assets located within the United States under the provisions of the Internal Revenue Code. Petitioner, on the other hand, argues that courts of this country have given effect to this decree and others like it for all purposes which are not in conflict with established public policy. We agree with the respondent for the reasons set out below.

Several courts have had occasion to consider the validity of and effect to be given this decree, although the precise question presented here has not been previously considered. In *Anderson* v. *N. V. Transandine Handelmaatschappij, supra*, the plaintiff, a resident of the State of New York, was an assignee for collection of a certain claim belonging to his assignor, the real party in interest, who was a nonresident alien, a citizen of Liechtenstein, and a resident of Cuba. Plaintiff brought an action against the defendants for failure to deliver to the assignor securities and Dutch currency deposited with defendants, attaching the assets which were located in the United States. Defendants were residents of Amsterdam and subjects of the Netherlands. The attachment was vacated upon motion of the defendants, and the State of the Netherlands intervened. Defendant's position was that title to the property and funds which the plaintiff sought to attach was vested in the State of the Netherlands under the decree of May 24, 1940. The Court of Appeals of New York, upon certification of the following question (p. 503),

"Did the Netherlands Royal Decree of May 24, 1940, operate to bar the levy of attachment by the plaintiff subsequent to the enactment of said decree on property in this state belonging to the defendants when said decree was entered and the title to which was declared by said decree to be thereby vested in the State of the Netherlands?"

affirmed the decisions of the lower courts vacating the attachment.

The New York court accepted as a part of the record therein a statement of the State Department of the United States setting forth its policy in respect to the effect to be given to the decree here in question. Pertinent portions of the State Department views are as follows:

The United States has an interest and concern in the subject matter and outcome of this action insofar as there is involved the question of the effect on assets within the United States of the decree of May 24, 1940, of the Royal Netherlands Government, purporting to affect title to certain assets of nationals of the Netherlands. * * *

* * * * * * *

* · * * at the time of the adoption of the Decree of May 24, 1940, the Royal Netherlands Government was recognized by the Government of the United States, and the Government of the United States has consistently taken cognizance of that Decree as an act of the Royal Netherlands Government; * * * However, * * * prior to the entry of the United States into the present war and to the signing of the Declaration of the United Nations, the Government of the United States did not adopt any policy with reference to the effect which should be given to that Decree on assets within the United States; * * *

It appears from the opinion of the Supreme Court of the State of New York herein (28 N. Y. S. 2d 547, at pages 553, 558) that that court gave to the expression of cognizance of June 27, 1940, a construction broader than was intended, apparently finding in it a determination by the executive branch of the Government relative to public policy ([28 N. Y. S. 2d] page 553) and holding that the Decree, "implemented by the recognition given to it by our national government, is self-executing" ([28 N. Y. S. 2d] page 558). On the contrary, * * * the recognition was merely of the Royal Netherlands Government and of the Decree as an act of that Government without the adoption at that time of any policy with reference to the effect which should be given to that Decree on assets within the United States, leaving that question, pending the adoption of such a policy, for judicial determination.

* * * however, * * * since the entry of the United States into the present war and the signing of the Declaration of the United Nations, the Government of the United States has adopted a policy with reference to the particular question presented by this case. That policy, * * * is as follows:

"It is the policy of the United States that effect shall be given within the territory of the United States to that Decree insofar as it is intended to prevent any person from securing an interest in, or control over, assets of nationals of the Netherlands located in the United States on account of claims arising outside of the United States in territory now or at any time under the jurisdiction of the Netherlands Government, for the benefit of persons who are not at the time of their assertion citizens or residents of the United States."

The foregoing statement of policy is made with express reservation * * * as follows:

"This statement reserves for further determinations of policy, in the light of further consideration and developments, all questions relating to the effectiveness

872

of the Decree as applied to other circumstances or persons and relating to the bearing of control which the Government of the United States may undertake through its executive and legislative branches to exercise over any assets purported to be affected by the terms of that Decree."

The Secretary of State, as shown by said communication, finds that the result of the decision of the Supreme Court of the State of New York, as affirmed by the Appellate Division, is in harmony with and will promote the policy of the United States, *but the Secretary expressly refrains from expressing any views as to the compatibility with that policy of all the reasons stated in the opinion of the Supreme Court of the State of New York. The Secretary points out that it would be highly desirable that this Court, in deciding the present case, confine itself to giving effect to the announced policy of the United States stated in that communication without expressing any view with respect to the effectiveness of the Decree as applied to persons and circumstances other than those referred to in the statement of policy set forth in that communication.*

It is submitted that the policy announced by the Department of State, if given effect, is dispositive of the controlling issues herein. As appears from the opinion of the Supreme Court of the State of New York (28 N. Y. S. 2d 547, 550), the plaintiff, although a resident of the State of New York, is what is commonly known as an assignee for collection, the alleged assignment to him having been made solely for the purpose of making him, instead of his assignor, the plaintiff in the action, and that the plaintiff's assignor is a non-resident alien, a citizen of a country in Europe said to be Liechtenstein, and is now understood to be resident in Cuba. It further appears from said opinion that the plaintiff's alleged cause of action arose outside of the United States in territory under the jurisdiction of the Netherlands Government. [Emphasis supplied.]

Clearly it was not necessary for the New York court to decide in that case whether it would enforce the Netherlands decree in a situation where the plaintiff was himself the real party in interest and a resident or citizen of the State of New York and of the United States, or where the State Department refused to recognize the Netherlands decree as a matter of public policy. The decree was designed basically to prevent property from falling into the hands of an enemy of the Netherlands. The Netherlands, by vesting property of its nationals in the government in exile, acted as conservator of the assets of its nationals, making specific provision for restitution subsequent to cessation of the hostilities. The decree is not offensive to any public policy of the United States upon its face, and we have no quarrel with the view that where the real party in interest is a national of a country other than the United States and is not a resident of the United States and where the claims are against Dutch residents, it is not offensive to our public policy to give effect to the decree. But whether to give effect to the decree where the rights against assets of Dutch domiciliaries are rights of United States residents or citizens or of the United States Government is an entirely different question.

A like view has been expressed by the Court of Appeals for the Second Circuit in *State of The Netherlands* v. *Federal Reserve Bank*, *supra*, where an American citizen, in violation of the Trading with the Enemy Act of 1917, purchased securities from a Swiss firm which had

secured them by purchase on the Paris black market from an agent of the German Government who had confiscated them from Jewish residents of Holland. The court held that the American resident purchaser had no valid claim to these bonds because of his violation of control legislation. The court further held that the decree of the Netherlands Government in Exile vesting in the Netherlands Government protective title to all claims belonging to Dutch domiciliaries was effective to permit the Netherlands Government to recover the bonds by appropriate interpleader in the action before the court. In so holding the court said (p. 461):

Of course we would endeavor to protect the rights of the original Dutch owners or their legitimate assignees to ultimate possession of their Nazi-confiscated securities if they were left to secure for their own property as best they could. But it seems clearly preferable to recognize the claim to protective possession by this plaintiff under its obligation to act only for the conservation of the rights of the former owners than to force the possibly complicated unscrambling of these rights upon American courts.

The court indicated clearly that the circumstances were such that to give effect to the decree would not violate the public policy of the United States as evidenced by any expresssion of the views of the State Department, and in fact would be fully in accord with the public policy of the United States which forbids such trading with the enemy as was done by the United States claimant. Therefore, the decree as an act of the Netherlands Government, a friendly government, was entitled to be given effect to whatever extent it did not conflict with public policy of the United States. The court emphasized, however, that in finding that the decree did not conflict "with any legitimate legislation or regulation of * * * our * * * public policy," the conclusion it reached was supported by the fact that so far as appeared therein "the claim of the Netherlands [did] not compete with any valid rights of United States residents."

We think it is clear that the opinions expressed by both courts indicate only that effect will be given to the Netherlands decree if to do so is not in conflict with the public policy of the United States. It was not decided whether to accord the decree full effect where rights of United States citizens or residents or of the United States are involved. No basic policy of recognition has been expressed by the State Department beyond that limited view previously quoted. And there has never been any legislative pronouncement with respect to the Netherlands decree. See generally Lourie and Meyer, "Governments-In-Exile and the Effect of Their Expropriating Decrees," 11 Univ. of Chi. L. Rev. 26 (1943).

We do not think that the decree of the Netherlands Government should be given effect where to do so would prevent the imposition and collection of a tax validly due the United States in the absence

of such a decree. The decree was not a general nationalization of assets of Dutch citizens and residents for all purposes,[1] but was a limited vesting order to secure title to the Netherlands Government in Exile for the purpose of conserving the assets of such Dutch citizens and nationals eventually for their own use and benefit, and in order to prevent the acquisition thereof by the enemy and use by such enemy of these assets. There is no relationship between such purposes and the objective for which we are asked to apply the decree in the circumstances of the instant case, and we think that it would be contrary to our public policy to treat petitioner differently than he would have been treated had the Netherlands Government not secured title for such purposes. The petitioner clearly had a right to reclaim these assets from the Netherlands Government upon cessation of hostilities. We think that such right is indicative of the real nature of petitioner's relation to these assets, namely, that while not technically owning them during the period in question, they were being held in protective custody ultimately for the benefit of decedent and those claiming under him as well as for the benefit of the Netherlands Government in preventing the enemy from obtaining title to the assets and the use thereof. Recognition of the decree as effective to defeat the application of Federal estate taxes would, we think, frustrate basic tax policy in this area. Cf. *In re Kahn's Estate*, 38 N. Y. S. 2d 839 (1942), where the court refused to give effect to the Netherlands decree and required local administration of the property of the decedent (a Dutch domiciliary) which was located within the jurisdiction of the forum on the basis of the public policy of the forum to protect the rights of domestic creditors, next of kin, and legatees of estates who are citizens or residents of the United States and of the forum.

It should be noted that the decisions in *United States* v. *Belmont*, 301 U. S. 324 (1937), and *United States* v. *Pink*, 315 U. S. 203 (1942), are not in conflict with our refusal to give effect to the Netherlands decree for the purposes of this case. In both cases the assets in question, which vested pursuant to a Russian expropriation decree, were the subject matter of an international agreement to which the United States and the expropriating government were parties. The overriding consideration of the Supreme Court in recognizing and giving effect to the expropriation order there in issue was obviously the fact that, under the international agreement, the confiscated property within the United States had been assigned to the United States in satisfaction of certain claims of the United States and its nationals.

---

[1] Obviously we do not now decide what effect might be given to such a decree. It might be pointed out, however, that the concept of territorial jurisdiction has been relied on in refusing to recognize the attempt of a foreign country to confiscate property not within the boundaries of the expropriating country. *Moscow Fire Insurance Co.* v. *Bank of New York*, 280 N. Y. 286, 20 N. E. 2d 758 (1939), affirmed without opinion by an equally divided court, 309 U. S. 624 (1940).

Recognition thus served to sustain the claim of the United States against the assets. In *Belmont* the Court specifically reserved for consideration in the appropriate case the question of "the rights of our nationals when, if ever, by proper judicial proceeding, it shall be made to appear that they are so affected as to entitle them to judicial relief," since there only the rights of the Russian corporation were affected by the Russian decree.

The case of *Bickford-Smith* v. *United States*, (Ct. Cl., 1948) 80 F. Supp. 660, relied on by petitioner, is distinguishable on its facts. There the Court of Claims held that shares of stock in a United States corporation owned by a British citizen, which were delivered to the British Government to serve as security for a Reconstruction Finance Corporation loan to England, were not subject to Federal estate tax as stock owned by a nonresident alien. The court considered that the decedent was not the owner of said shares at the time of his death even though title to the shares of stock was not transferred on the books of the corporation and even though decedent at the date of his death had the right to receive from the British Treasury the equivalent in British money of the dividends paid and also the right to be paid the market value of the stock if the British Government decided not to release it.

It is evident that decedent's stock was not taken by a vesting order for a limited purpose. The British Government had acquired from the decedent full ownership of the stock for a promise to ultimately return comparable stock or an equivalent value in cash. The British Government intended to make use of the decedent's stock and was not merely holding it to prevent an enemy from acquiring it. We think the decedent's act of turning the stock over to the British Treasury was in effect a sale of the stock for a promise to return either comparable securities or cash, and that such promise (which was all that the decedent owned at the date of death) was clearly not property deemed within the United States for estate tax purposes.

## Issue II.

At the date of death, the decedent owned both United States certificates for shares of stock in American companies and certificates issued by Dutch organizations (administration offices) representing a beneficial interest in shares of stock of United States corporations, all of which were physically located in Holland. The respondent determined that the value of these certificates was includible in the decedent's gross estate under section 862 (a) and valued them on the basis of New York stock market quotations as provided in Regulations 105, section 81.10 (c), in the amount of $53,681.25. Petitioner concedes in his reply brief that both the shares and certificates are

includible in the gross estate and raises only the issue of the value at which they should be included. Petitioner contends that if the shares and certificates (in terms of the underlying shares) had any value at the date of decedent's death for United States estate tax purposes, such value was not more than 10 per cent of the price at which comparable unrestricted securities physically situated in the United States could have been sold at the date of the decedent's death.

We think that the respondent's determination of fair market value of the securities includible in decedent's gross estate is manifestly incorrect, and that it does not accord with the rule of Regulations 105, section 81.10 (c). The regulation provides generally for the use of New York Stock Exchange quotations in finding the fair market value of stocks but expressly limits application of that technique of valuation in cases where such quotations would not truly reflect the fair market value of securities included in the gross estate. In such circumstances, other factors bearing on value must be considered in determining the actual fair market value of the securities. Regulations 105, section 81.10 (c), provides in pertinent part, as follows:

In cases in which it is established that the value per bond or share of any security determined on the basis of selling or bid and asked prices as herein provided does not reflect the fair market value thereof, then some reasonable modification of such basis or other relevant facts and elements of value shall be considered in determining fair market value.

We think it is obvious that in valuing securities in terms of United States dollar figures, as is required for estate tax purposes, diminution in value caused by war and governmental restrictions must be reflected in determining the fair market value of the property. See *Morris Marks Landau*, 7 T. C. 12 (1946) ; *Estate of Ambrose Fry*, 9 T. C. 503 (1947) ; *Estate of Anthony H. G. Fokker*, 10 T. C. 1225 (1948) ; *Estate of Jan Willem Nienhuys*, 17 T. C. 1149 (1952).

While we do not think that the securities involved in this issue were worthless, we think it is evident that their value at the date of decedent's death in 1943 was substantially less than the market value of comparable unrestricted securities being freely sold in the United States on that date. At the date of decedent's death both the shares in United States companies and the Dutch certificates representing a beneficial interest in shares of stock of American companies (held by Dutch administration offices) were located in Holland, which was then occupied by the Germans. The United States was at war with Germany. Communication and commerce between occupied Holland and the United States, as well as other countries of the Allied Powers, was severely restricted, if possible at all. Normal dollar-guilder foreign exchange transactions were nonexistent. No dividends were paid to the decedent or his estate on any of the shares in United States companies from the outbreak of the war. Dividends payable by the Amer-

ican corporations on the Dutch certificates (bearer certificates with dividend coupons attached) were normally paid to the Dutch organization which issued the certificates and then distributed by such organization to the holder of the certificates in guilders (less expenses), but no such payments or distributions were made during the period in question. Furthermore, at the date of decedent's death there were in effect a Netherlands decree imposing restrictions on the sale of property of Dutch nationals in foreign exchange, a United States Executive order prohibiting transactions in foreign exchange and transfers of credit or export of currency except as authorized by special license, and the Devisen Decree of the German occupation authorities requiring a license to sell assets located in Holland for a foreign currency.

Clearly, except by special license from several authorities, neither the shares nor certificates located in Holland at the date of decedent's death could be sold for United States dollars. Moreover, the evidence establishes that there was no market in the United States for either the shares in American companies or the Dutch certificates as long as they were physically located in Holland. However, the various decrees and orders were not absolute prohibitions, and there is no evidence that the licenses required in order to trade the securities for foreign exchange could under no circumstances be obtained. We are not unmindful of the sacrifice and risk involved in such transactions, but the possibilities for trading convince us that the shares and certificates here in issue had some value, convertible in an appropriate manner into United States dollar figures. See *Estate of Jan Willem Nienhuys, supra.*

Our view is supported by the testimony of K. Blom, petitioner's witness, on cross-examination, to the effect that despite any limitations on the ability to trade in the securities owned by decedent and despite war conditions the securities still had value. Doubtless petitioner makes the following concession partly in view of this testimony. Petitioner in its brief states:

Petitioner is willing to concede that the value of these certificates should be determined by (1) taking the value in dollars of corresponding unrestricted securities at the date of the decedent's death as reflected by transactions on the New York Stock Exchange, (2) converting such values into guilders at the last official rate of exchange which was $0.5309 per guilder, and (3) then converting such guilders into United States dollars at the rate of $0.05 per guilder * * * In no event, however, should such guilders be converted at a rate in excess of $0.10 per guilder * * *

The extent of value conceded by petitioner is based on the uncontroverted testimony of its expert witness as to the value of the securities in issue, and on our holdings in *Morris Marks Landau, supra, Estate*

*of Anthony H. G. Fokker, supra,* and *Estate of Jan Willem Nienhuys, supra.*

*Morris Landau* involved valuation of blocked South African pounds for gift tax purposes. The taxpayer had made a gift of blocked pounds which it would have been impossible for him to have freed from the restrictions on exchange limiting transfer of funds from the Union of South Africa. United States dollars could not have been realized by the petitioner. In fixing the exchange rate for conversion at less than the official rate of exchange for free pounds, we gave effect to the impact on the value of the taxpayer's property of the generally disturbed conditions and the restrictions on foreign exchange.

In *Fokker* we were required to determine the value for estate tax purposes of certain guilder assets located in Holland and Switzerland, measured in terms of United States dollars. The value of the properties in Dutch guilders was not in dispute, and the only question before us was the rate of exchange to be used in converting the Dutch guilders into American dollars. At the date of valuation, December 23, 1940, Holland was occupied by the German Army, foreign transactions were blocked except by special license, and no official rate of exchange existed for that date. The last official rate of exchange was $0.531 per guilder. Furthermore, there was no market in the United States for blocked Dutch guilders. Applying the principle expressed in *Morris Marks Landau, supra,* where we fixed the amount of a gift as the value of blocked South African pounds in terms of dollars, we determined that the value of the blocked Dutch guilders was 5 cents per guilder as conceded by the petitioner. Similarly, in *Nienhuys,* the April 8, 1947, value of the decedent's property in the Netherlands was known in terms of Dutch guilders. However, such value was obviously depressed by government blocking restrictions then in effect, and we held that the respondent's application of the official rate of exchange of $0.37695 was in error. We determined that the value of decedent's property could be found by converting the guilder value into United States dollars at the rate of $0.10 per guilder.

Unlike either *Fokker* or *Nienhuys,* the guilder value of the assets in issue in the instant case is not agreed upon or otherwise known. However, since we have determined that the securities in question did have some value, that value must be determined under the estate tax provisions of the statute, *Ithaca Trust Co.* v. *United States,* 279 U. S. 151 (1929), despite the difficulty of fixing an exact value for property located outside of the United States in wartime and subject to various foreign exchange restrictions. *Estate of Jan Willem Nienhuys, supra.* In circumstances where there is no market in the United States in which dollar values can be realized, conversion of other values into dollar terms must be accomplished by other means. We think that

the method urged by petitioner is not unreasonable. Petitioner would, in effect, accept respondent's determination as to the dollar value of comparable unrestricted securities selling on the New York Stock Exchange on the date of decedent's death as the basis for conversion into guilder value at the last official rate of exchange, established some three years before, and then reconvert this guilder value into dollar figures by the rate of exchange to be determined here. We think that this method quite adequately reflects the value of securities located in Holland, since the then current New York Stock Exchange quotations on the date of decedent's death would reflect the various changes in value of the underlying shares from the date of the last official exchange rate. Reconversion of that guilder value at the actual rate of exchange on the date of decedent's death will thus yield a value adequately reflecting, we think, in the required dollar figures, the fair market value of the shares and certificates at the date of death.

Petitioner contends that on the basis of the testimony before us and in view of the $0.05 rate of exchange determined by us in *Fokker* for December 23, 1940, the applicable rate in the instant case should be $0.05. However, petitioner contends alternatively that if some other rate of exchange is to be applied, it should not exceed $0.10 as determined in *Nienhuys* for April 8, 1947. Petitioner argues that conditions reflected by the rate of exchange of $0.05 on December 23, 1940, in *Fokker*, more closely compare with those existing on July 23, 1943, the date of decedent's death, than those existing in 1947. In 1947 the war was over, and the allies, including Holland, had been victorious. Trade, while still subject to restriction, was resuming. In 1943, however, the world was still at war and it was impossible at that time to foretell the duration of the war or the victor, a situation more like that existing in 1940. Nevertheless, world conditions in 1943, while still very much in doubt, were perhaps less so than in 1940 at a time when the United States was not at war with Germany and when the battle of Britain was in its darkest hour. After careful consideration of all of the evidence before us, our best judgment is that the decedent's properties in Holland should be valued on the date of his death by converting their guilder value (by the technique approved above) into United States dollars at the rate of $0.065 per guilder, a rate of exchange not seriously objected to by petitioner.

We think that the principles expressed in *Estate of Ambrose Fry*, *supra*, are fully consistent with our views in the instant case and the views expressed in the cases which we cite. In *Fry* certain blocked British assets, located in Britain, were valued on the basis of the amount which could, in the circumstances of that case, have been realized in the United States by lawful means. It would have been virtually impossible, however, to realize United States dollars for the assets in question in the instant case, and under the circumstances

we have held that valuation for estate tax purposes may be accomplished (in the absence of an American market) by converting value in other terms into terms of dollars by a rate of exchange which reflects the factors bearing on value. In other words, if an amount had actually been realizable in United States dollars, our holding would have been based thereon; but since there could have been no realization of dollars in respect to the blocked assets under consideration, it is necessary to translate foreign value into dollars for estate tax purposes by conversion at an appropriate rate of exchange which will reflect the various restrictions and other factors impinging on value.

### Issue III.

Deductions from the gross estate of the decedent, a nonresident alien, are to be computed in accordance with section 861 (a) (1) of the Internal Revenue Code allowing that proportion of the deductions permitted under section 812 (b) (except as otherwise specified) which the value of the gross estate situated in the United States bears to the value of the entire gross estate wherever situated. It has been stipulated by the parties, *inter alia:*

that upon submission of proof satisfactory to the respondent with respect to the payment of administration expenses or attorneys' fees in connection with these proceedings, such administration expenses or attorneys' fees, if any, will be allowed in computing the deductions to which the petitioner may be entitled under Section 861 (a) (1) of the Internal Revenue Code in the computation submitted in accordance with Rule 50 of the court's Rules of Practice.

Therefore, only the value of the decedent's entire gross estate and the value of that portion situated within the United States for estate tax purposes need to be determined.

At the date of his death, the decedent owned various assets in many parts of the world, including certain assets situated in Indonesia. Respondent contends that petitioner has not shown the extent and value of the Indonesian assets and, therefore, has failed to prove the value of the gross estate wherever situated. In this respect, Blom, who·is a partner of the firm of Kantoor H. J. Vooren which handled the administration of the estate, testified on cross-examination that the Indonesian assets "might be of some value, but a rather small amount, and very difficult to ascertain an objective value." On re-direct examination, he stated that at the date of the decedent's death, Indonesia was occupied by Japan and that even at the date of the hearing, there was no effective contact with Indonesia, and he did not even know whether the assets existed. He also stated that the Indonesian assets are still blocked, and valuation "depends upon the personal ideas of the value you will give to such assets blocked )ver there." In the opinion of the witness, the assets were not worth 10,000 guilders.

Despite the brevity of the testimony offered as to the value of the Indonesian assets owned by the decedent, absent any other evidence of value, we think that the value of the decedent's Indonesian assets was not in excess of 10,000 guilders on the date of death. It is evident that valuation of foreign assets located in enemy occupied territory is difficult of precise proof. We think that petitioner has met the burden of proof, in the light of the unusual circumstances confronting it, and should not be denied a deduction to which it is substantially entitled.

In order to avoid the necessity of valuing each of the divers assets owned by the decedent by converting numerous currencies into United States dollars, the parties have stipulated, *inter alia:*

that for the purposes of computing the deduction to which the petitioner may be entitled under Section 861 (a) (1) of the Internal Revenue Code, non-Guilder assets shall be converted into Guilders at the official rate of exchange, and that the resulting Guilders shall be converted into Dollars at whatever rate the Court shall determine to be appropriate on the date of the decedent's death.

The respondent contends that the petitioner has failed to prove the dollar value of the guilder on July 23, 1943, for the purpose of converting the agreed-upon guilder value of the decedent's assets into dollars. In Issue II, we determined that on the date of the decedent's death the fair market value of the guilder in terms of United States dollars was $0.065. That determination is controlling here. Our reasons for determining this amount as a fair rate of exchange were fully set out above and need not be further discussed.

## Issue IV.

The respondent assessed a 25 per cent delinquency penalty in the amount of $56,891.56 in August 1951, and in the notice of deficiency determined an additional delinquency penalty, totaling $189,662.33, in accordance with section 3612 (d) (1), for failure to timely file an estate tax return on behalf of the estate of the decedent.

The petitioner presents two arguments: (1) That an estate tax return was timely filed under sections 864 and 3804 (and regulations, T. D. 5279, 1943 C. B. 953, as amended by T. D. 5610, 1948–1 C. B. 98, promulgated thereunder); and (2) that in the circumstances of this case there was reasonable cause for delay in filing the return, and accordingly no penalty should be imposed.

Respondent in his brief does not counter petitioner's argument that an estate tax return was timely filed. On the other hand, the point is not conceded and respondent continues to assert the delinquency penalty previously assessed. In these circumstances, we do not think that respondent should be considered as having abandoned the assessment of a delinquency penalty. However, since we are of the view, expressed below, that if there was any delay in the filing of an estate tax return on behalf of the decedent, such delay was, under the cir-

cumstances of this case, due to reasonable cause and not to willful neglect, we find it unnecessary to consider petitioner's contention that an estate tax return was timely filed.

What constitutes "reasonable cause" within the meaning of section 3612 (d) (1) depends in each case on the circumstances of that case. We think that in the instant case the circumstances fully justify a finding that there was reasonable cause for delay in filing and that such delay was not due to willful neglect.

It is evident that neither the executor nor those having a power of attorney from him were aware at any time prior to April 1949, that the filing of a Federal estate tax return might be required. At the date of the decedent's death and until May of 1945, Holland was occupied by the Germans, and there were no means of communication between Holland and the United States. During this period of time and until June of 1948, the executor of the estate was residing in Switzerland. The other members of the Oei family were then residing in Holland.

Until April of 1949 the executor of the decedent's estate and his brother, Hing, who had a power of attorney from the executor, both evidently relied upon the Guaranty Trust Company of New York or The New York Trust Company to look after their interests in America. Until that time, neither the executor nor any member of the Oei family ever received any communication from either the Guaranty Trust Company of New York or The New York Trust Company indicating in any way that a United States estate tax return should be filed for the decedent with respect to the assets and property owned in the United States by the Stiftungs. Nor was any mail or other communication ever received from anyone else in the United States informing them that a United States estate tax return should be filed with respect to the decedent's estate.

Within a reasonable time after April 1949, a return was in fact filed under circumstances clearly reflecting the quality of the action. In the spring of 1949, Harry J. Rudick, counsel in this proceeding, was consulted with respect to the status of the two Stiftungs for United States tax purposes. It was his opinion, rendered in writing, that the Stiftungs were taxable as foreign corporations for United States tax purposes. On that assumption, the decedent's estate would not have been liable for United States estate tax on the assets owned by the Stiftungs. He recommended, nevertheless, that a Federal estate tax return should be filed. Thereafter, arrangements were made for Rudick to go to Amsterdam in order to assemble the necessary data required for the United States estate tax return. A return was prepared by Rudick in Amsterdam in July 1949, and it was executed there by Oei Ing Hing and K. Blom as attorneys in fact for the executor, Oei Ing Tjhing.

We think that the actions of the executor of decedent's estate and of those duly appointed by him to act on his behalf were not acts of willful neglect and that under the unusual circumstances of this case there was reasonable cause for any delay in filing. At all times from the creation of the Stiftungs, decedent, until the time of his death, and thereafter those responsible for the affairs of decedent's estate, including the two New York banks, appear to have considered the Stiftungs to be foreign corporations and taxable as such for United States tax purposes at least until April 1949. This is evidenced in part by the various custody agreements which recited that the Stiftungs were foreign corporations, the internal records of the banks, and the letters written by the decedent to the banks. Moreover, the New York Trust Company at the time the account was opened at that bank consulted White & Case, its general counsel, as to the legal status of the Kien Stiftung and as to how such Stiftung should be treated for tax purposes. White & Case rendered a written opinion in which the view was expressed that the Stiftung should be treated as a corporation and that it was believed that the Treasury Department would regard such Stiftung as an association taxable as a corporation. Furthermore, the Guaranty Trust Company of New York filed United States nonresident foreign corporation income tax returns on behalf of the Yan Stiftung.

We think it evident from our Opinion herein that the question of the status of the Stiftungs for Federal estate tax purposes is difficult and complex. It was very unlikely that it would have occurred to anyone other than a tax expert of highly specialized training that the filing of an estate tax return was required. Such circumstance can hardly be ignored in considering the reasonableness of the belief of those responsible for filing an estate tax return on behalf of the decedent, and the reasonableness of the cause for delay in so filing.

We hold, therefore, that the 25 per cent delinquency penalty is not to be applied.

*Decision will be entered under Rule 50.*