**BICKFORD–SMITH et al. v. UNITED STATES.**

No. 46475.

Court of Claims.

Nov. 1, 1948.

Charles W. Gross, of Hartford, Conn. (Reese H. Harris, Jr., and Gross, Hyde & Williams, all of Hartford, Conn., on the brief), for plaintiffs.

Joseph H. Sheppard, of Washington, D. C., and Theron L. Caudle, Asst. Atty. Gen. (Andrew D. Sharpe and A. F. Prescott, both of Washington, D. C., on the brief), for defendant.

Before JONES, Chief Judge, and MADDEN, HOWELL, WHITAKER and LITTLETON, Judges.

MADDEN, Judge.

The plaintiffs, British citizens, are the executors of the last will of John Clifford Bickford-Smith who was also a British citizen and a resident of England, and who will hereinafter be referred to as the decedent. On August 7, 1941, the decedent owned and possessed 5,391 shares of The Ensign-Bickford Company, a Connecticut

corporation located in Simsbury, Connecticut.

The British Government in 1941 desired to borrow $425,000,000 from the Reconstruction Finance Corporation, an agency of the United States Government. It proposed to deposit as collateral to secure the loan stocks of American corporations which stocks it intended to obtain from British citizens. A loan agreement was made with the Reconstruction Finance Corporation, and is referred to in our finding 4. It was made contingent upon the enactment of enabling legislation in Great Britain under which that Government could obtain from its citizens the American stocks to be used as collateral. On July 29, 1941, the British Parliament enacted the Financial Powers (U. S. A. Securities) Act 1941. See finding 5 for a reference to the Act, and finding 6 for a reference to the Regulations issued by the British Treasury pursuant to the Act. The effect of the Act and the Regulations was that a British owner of stock in an American corporation might be required to deliver the stock to the Treasury "in a form which will enable the Treasury to dispose of it for all the interest of which that person is competent to "dispose" and also to deliver, with the stock, dividend orders and voting proxies.

On August 7, 1941, the British Treasury made a written demand upon the decedent that he deliver his 5,391 shares of the stock of The Ensign-Bickford Company, and he did so on August 20, 1941, accompanying the stock, as required, with an executed power of attorney for transfer, a dividend mandate, and a voting proxy. A formal receipt was given the decedent by the Treasury, which receipt stated that the stock had been placed "at the disposal" of the Treasury pursuant to the Act and the Regulations. The Treasury sent the shares of stock to New York where they were deposited with the Federal Reserve Bank of New York to be held by it as collateral for the Reconstruction Finance Corporation loan to the British Government. The stock is still held by that bank for that purpose. No change in ownership has been requested or shown on the books of The Ensign-Bickford Company. Pursuant to the dividend order given by the decedent and to Article Fourth of the Loan Agreement with the Reconstruction Finance Corporation, all dividends which have been paid by the corporation on the stock have been paid to the Reconstruction Finance Corporation to be applied to pay the interest and principal of the loan. The Financial Powers Act provides that when dividends are paid by the corporation to the Reconstruction Finance Corporation, the British Treasury will pay an equivalent sum in British money to the person who deposited the stock.

The plaintiffs' decedent died on October 3, 1941. Section 862 of the Internal Revenue Code, 53 Stat. 131, 26 U.S.C.A. § 862, provides that "(a) Stock in a domestic corporation owned and held by a nonresident not a citizen of the United States shall be deemed property within the United States; * * *" and other pertinent provisions of the statute make such stock so owned and held subject to the federal estate tax. If, therefore, the plaintiffs' decedent at the time of his death "owned and held" the stock here in question, an estate tax was payable on its value. The Commissioner of Internal Revenue ruled that the tax was payable. A claim for refund was duly filed and rejected and this suit followed. We must, therefore, decide whether the plaintiffs' decedent at the time of his death was the owner of the stock. We think that the words "and held" in Section 862 add nothing which is relevant in this case, to the meaning of the statute.

We now examine more closely the rights which the decedent had, and the powers, privileges and immunities which the British Government had, in the stock, since we suppose that if the plaintiff didn't own it the British Government did own it, the Reconstruction Finance Corporation being only a pledgee of the stock.

The British Financial Powers (U. S. A. Securities) Act, 1941, under which the stock was taken from the decedent, provided in Section 2, (1), (2), and (8) as follows:

"2. (1) Where any security has been placed at the disposal of the Treasury by virtue of this Act, it shall be released by the Treasury as soon as may be after they have satisfied themselves, at any time while

it is under their control, that it is no longer necessary or expedient for the purposes of the Agreement that they should retain control thereof:

"Provided that—

"'(a) the Treasury may, if at any time it appears to them necessary or expedient so to do for the purposes of the Agreement, by order made as respects any class of securities or by direction given as respects any particular securities, declare that the right to release conferred by this subsection shall be extinguished in the case of the securities to which the order or direction relates;

"'(b) if any security is so dealt with in pursuance of the Agreement as to prevent the Treasury regaining control thereof under the Agreement, the right to the release of that security shall be extinguished.'

"(2) If at any time the right to the release of any security is extinguished, the Treasury shall as soon as may be thereafter pay in respect of the security such sum in sterling as they may determine, being a sum which in their opinion is not less than the market value thereof at that time:

"Provided that, if the Treasury certify that the security was of such a kind as not to be capable of being valued on the basis of market value, the sum to be paid shall be such sum in sterling as may be agreed or, in default of agreement, as may be determined by arbitration to have been the fair value thereof at that time as between a willing buyer and a willing seller.

\* \* \* \* \* \*

"(8) Any right conferred by this section to the release of a security of any description may be satisfied by the release of any security of that description, and any such right to the release of a security may be satisfied by the release of any security substituted therefor by the exercise of any right of exchange or conversion or any similar right attaching to the security."

These provisions seem to show that it was contemplated that the stock would, normally, be ultimately returned to the depositor. No time was set, however, within which the Government would have to return or otherwise settle for the stock. And,

early or late, the Government could by the making of an order, eliminate all question of a return of the stock, and become obligated to the depositor for the then market value of it. And Section 2 (8), quoted above, empowered the Government to substitute "any security of that description" for the shares actually deposited, in releasing shares to the depositor.

Indicia of ownership in the plaintiffs' decedent at the time of his death were the right to receive from the Treasury the equivalent in British money of the dividends which might be paid upon the stock, and the right to be paid the then market value of the stock if the Government should decide that it would never release the stock. The right to income from property, and the chance of gain and risk of loss from later increases or decreases in its market value usually accompany ownership, and accompany no other relation to property. The provision of the British Act whereby the depositor of stock was not allowed to receive the actual dollars paid in dividends, which were to go to the Reconstruction Finance Corporation, but was to be paid an equivalent sum in British money, amounted perhaps to no more than a wartime restriction requiring British citizens to turn their dollars in to the Government for sterling, so that the Government would have the use of the dollars which it needed so badly.

Though we have adverted to strong indicia of ownership in the plaintiffs' decedent, we have nevertheless concluded that he was not the owner of the stock within the meaning of Section 862 of the Internal Revenue Code. He had no right to the return of the stock, either soon or late. He had no right even that the stock be kept available, subject to the pledge to the Reconstruction Finance Corporation, until the Government either released it to him or extinguished any possibility of a release and substituted its obligation to pay him the then value of it. The Government could, under Section 2 (8) of the statute, have sold the stock in the hope of buying similar stock cheaper at a later time and releasing the substituted stock to the depositor. If Section 2 (8) did not mean that, it is hard to see what it meant, as there would be no

advantage to the Government in substituting other similar shares if the ones deposited were still available.

We have then, as between the plaintiffs' decedent and the British Government, the two possible owners, all the documentary indicia of ownership in the Government, plus a complete immunity from any claim for a return of the stock, and a complete power to do as it pleased with the stock at any time, being accountable only for paying the equivalent of dividends in the meantime, and for, at its option, paying the market value or returning the same or substituted shares at some time in the future. We think that the plaintiffs' decedent had a chose in action, which the obligor, the British Government, could satisfy by alternative performances, at its option, and that he did not continue to own the stock.

The plaintiffs rely strongly, and with reason, upon the decision of this court in James v. United States, 63 Ct.Cl. 379. In that case the British decedent had deposited shares in American corporations with the British Treasury pursuant to the British Finance Act, 1916, the shares to be at the "absolute disposal" of the Treasury. The court held that the same estate tax statute here in question did not apply to the shares, since the decedent did not own and hold the shares but had only a chose in action against the British Government, its obligation being "wholly contractual." The differences between the present case and the James case, that in the latter case the stock had been transferred to the British Government on the books of the corporation whereas in the instant case it had not, and that in the James case the British Government, after the decedent's death but before the litigation, had actually sold the stock, do not seem to us to be material. As to the latter point, the court mentioned it in the James case as an indication of the power which the British Government had over the stock, and it has that same power under the law and the terms of the deposit in the instant case. As to the first point, the change of ownership on the books of the corporation would add nothing to the British Government's already complete powers over the stock, including the express powers to sell it, to vote it, and to collect the dividends on it. In the James case the court relied on Provost v. United States, 269 U.S. 443, 46 S.Ct. 152, 70 L.Ed. 352, where it was held that a "loan" of stock by one broker to another to enable the latter to deliver on a short sale, it being contemplated that the same shares would not be returned, and other shares later acquired would be returned in their stead, was a sale of the stock and required the payment of the stamp tax applicable to sales. In the instant case, the substitution of other shares for the deposited ones was one of the alternatives which the British Government could, at its option, resort to, hence the Provost case is pertinent here.

The Government makes a good deal of the fact that Great Britain also imposed an estate tax upon the decedent's estate, and listed in his estate these shares. Of course, the decedent owned something of value in relation to these shares, and that something was subject to the British Estate Tax, whether it was the shares themselves or the Government's promise in regard to them. The tax would have been the same whether it was the one or the other, hence we think that the designation used is not important. The Financial Powers (U. S. A. Securities) Act, 1941, itself, in Section 2 (4) and (5) designates the depositor's right as a right to "release or payment", which is an accurate description and is no indication that British law regarded the decedent as the owner of the stock.

The Government urges that the British Emergency Powers (Defense) Acts of 1939 and 1940 and the Regulations promulgated pursuant to them, referred to in our finding 29, provided a method whereby the British Government, when it so desired, acquired possession of and absolute title to stocks and other securities belonging to its citizens. It argues that, if the purpose had been to acquire the absolute title to the decedent's stock here in question it would have been done under these Emergency Powers Acts. We recognize readily that the arrangement under which the British Government received the deposit of the decedent's securities was different from an outright acquisition of them with a duty to

immediately pay for them. Instead, it gave the Government the use of them without paying for them unless and until it should decide that it would never release the same or equivalent securities to the depositor. There was, therefore, reason enough for the Government to have two different methods of acquiring securities for its use. But the fact that one of them was a plain and obvious acquisition of ownership by the Government does not determine that the other was not also an acquisition of ownership, by no means plain and obvious, but which, our analysis leads us to conclude, was the legal result of what was done.

The plaintiffs are entitled to recover $189,128.61, with interest as provided by law.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.