CoweN, Chief Judge,
delivered the opinion of the court:
Plaintiff is the Ancillary Administrator of the estate of Charles Wehrli, deceased, who was a citizen and resident of Switzerland and who died on November 2, 1948. Plaintiff brought this action for the refund of Federal estate taxes and interest which were imposed pursuant to the provisions of *99 Sections 811, 861, and 862 of the Internal Revenue Code of 1939, 26 TJ.S.C. §§ 811, 861, and 862 (1952 Ed.).[1] The question for decision is whether at the time of his death the decedent owned certain securities which were then in the physical possession of the Guaranty Trust Company of New York.
The facts are set forth in detail in our findings of fact and will be summarized only to the extent needed to explain the basis for the result we have reached. The decedent owned and operated a bank in Zurich, Switzerland, and from 1937 until his death, his son, Peter Wehrli, was associated with him in business and investments. Beginning in 1939 and continuing throughout the period involving the transactions in this case, Peter Wehrli was fully authorized to act for his father.
In 1939, two corporations were organized under the laws of Argentina. The first was named Stella S.A. Argentine Commercial Industrial y Financiera, hereinafter Stella, and the second was named San Juan Sociedad Anónima Commercial Financiera and Industrial, hereinafter San Juan. The Argentine corporations were formed with the assistance of decedent’s nephew, who acted as nominee for decedent and his associates, Max Reutter and Karl Kessler. Funds and securities belonging to decedent and his associates were transferred to the two corporations because of fear that the German Army might invade Liechtenstein and Switzerland and seize any assets found there. Both corporations engaged in the purchase and sale of securities in South America, New York, and London.
San Juan and Stella opened securities custody accounts with the Guaranty Trust Company of New York in 1939 and 1942, respectively. Both companies designated Peter Wehrli, decedent’s son, solely, or Cordova Moyano and Robert J. J. Lagier, signing jointly, as the sole persons whose instructions on behalf of the two corporations should be recognized and complied with by Guaranty Trust Company. Their powers included the power to withdraw securities free of payment.
*100 From time to time, securities held in the Guaranty Trust custody accounts in the names of San Juan and Stella were sold and other securities were purchased. At the time of decedent’s death, the securities upon which the estate tases were levied consisted of stocks in United States domestic corporations, Eepublic of Uruguay bonds, and six-percent debentures of Liebmann Breweries, Inc. The shares of stock and debentures were registered on the books of the various corporations' in the name of the nominee of the Guaranty Trust Company, and this was also true of the Uruguay bonds.
In connection with the settlement of decedent’s estate, an inventory was prepared for Swiss tax purposes. The Swiss tax authorities discussed with Peter Wehrli the assets to be included in the inventory and all of the securities in issue here were listed in the inventory. All of the securities, plus cash in the custody accounts of Stella and San Juan, were ultimately distributed either to the heirs of the decedent or were used in payment of administration expenses.
On May 1, 1950, plaintiff, as Ancillary Administrator, filed a nonresident alien estate tax return and paid $86,606.16, the tax shown to be due thereon, plus interest. On November 14, 1952, the Collector of Internal Eevenue corrected the total value of the securities and assessed a deficiency estate tax of $6,030.65, and on December 5,1952, the deficiency, plus interest thereon, was paid. Thereafter, plaintiff filed a timely claim for refund of the total amount of the estate tax so paid and filed this suit after the claim was disallowed in its entirety.
In Burnet v. Brooks, 288 U.S. 378 (1933), the Supreme Court construed Sections 302(a) and 303(b) of the Eevenue Act of 1924 which, in pertinent part, are the same as Sections 811(a) and 861(a) of the Internal Eevenue Code of 1939. As a result of that decision, there is no longer any question that bonds of foreign governments and of foreign and domestic corporations, as well as stocks of foreign corporations and domestic corporations, belonging to a nonresident alien but physically within the United States at the time of his death are includible in his estate for Federal estate tax purposes. It is undisputed that all the securities in issue here were situated in the United States at the time of decedent’s *101 death. Therefore, they were subject to the Federal estate tax if he owned them at the time of death.
Plaintiff’s basic contention is that Stella and San Juan had all of the privileges of ownership in the securities in the custody accounts in the Guax-anty Trust Company and, therefore, that decedent was not the owner and holder of the securities at the time of his death within the meaning of Section 862(a) of the Internal Revenue Code of 1939, 26 U.S.C. § 862(a) (1952 Ed.).[2]
In support of his contention, plaintiff points to our findings 12(c) and 14(b), which state that after the securities had been acquired and subject only to restrictions resulting from the blocking of the custody accounts, pursuant to wartime regulations, San Juan and Stella had complete power to deal with the securities, including the power to sell them, to vote the stock, and to collect the dividends on the stock and the interest on the bonds. Guaranty Trust Company collected the interest and dividends for the account of San Juan and Stella. It is true that such findings, standing alone and isolated from the remainder of the record, lend support to plaintiff’s theory of the case. However, the indicia of ownership in San Juan and Stella are shown to be entirely superficial when matched against the solid array of evidence as to the capacity in which each corporation acted. In our view, the following summarized facts demonstrate quite conclusively that every action which San Juan and Stella took with respect to the securities throughout the period pertinent to this action was performed in a capacity which each corporation accurately characterized as that of a mere depositor and custodian for the decedent, the real owner:
(a) On April 21, 1942, the Secretary of the Treasury issued General Ruling No. 12 (5 F.R. 1400), which, as a part of the wartime restrictions on blocked accounts, provided that no transactions involving securities in blocked accounts could be effected unless the person with whom the account *102 was maintained was in possession of tbe name and address of each, person having an interest in the securities on April 8, 1940, or on the date when the securities were received in the account.' In 1945, Guaranty Trust Co. requested Stella to furnish the information called for by General Ruling 17 and, in response thereto, Peter Wehrli wrote the bant on Stella’s letterhead, stating that all the securities in Stella’s custody account at the bank since April 8,1948, or the date when the securities were deposited, were the property of the decedent,a citizen of Switzerland.
! (b) On June 7, 1948, Peter Wehrli wrote plaintiff’s law 'firm, retaining the firm to take ¡whatever stepsl that were necessary to obtain a release of the blocked accounts of San ■ Juan and Stella in the Guaranty Trust Company.. The letter stated that Peter Wehrli and his father were the “sole legal and beneficial owners” of the securities in the custody accounts .and that “no other person, firm, corporation or-asso-' ciation has any legal, beneficial, or equitable ownership”therein.
(c) On June 9, 1948, Peter Wehrli wrote the Guaranty Trust-Company that the Uruguay bonds on deposit in San Juan’s custody account were the property of Charles Wehrli. Under date of July 1, 1948, plaintiff informed the Office of' Alien Property that the securities involved here were held by Stella and San Juan for Charles Wehrli and Peter Wehrli, who owned them. Thereafter, on January 26,1949, plaintiff filed an application for authorization to Guaranty Trust to unblock the securities in the custody accounts of San Juan- and Stella and therein stated that the securities were owned by the decedent. Upon the granting of the application, a - license was issued, reciting that the securities were all beneficially. owned by decedent.
(d) On November 13,1948,11 days after the death of his father, Peter Wehrli wrote Guaranty Trust and requested the-bank to forward to Switzerland a schedule listing all the - securities deposited in the custody accounts of San Juan and Stella. He directed the bank that it should state that the securities were the property of the decedent.
(e) All of the securities in issue were carried on the books of Stella and San Juan in accounts entitled “Depositors of *103 Securities for Safekeeping, Administración Confidencia I.”, a code name for the decedent. Stella and San Juan so certified all the securities to the Swiss tax expert, who represented the decedent’s estate, and all of such securities were listed in the inventory of decedent’s assets as required by Swiss law in the settlement of his estate. That action was taken after the Swiss authorities had consulted with Peter Wehrli.
(f) Guaranty Trust prepared, as of November IT, 1948, a statement- of securities held in which it was stated that. Mr. Charles Wehrli, the deceased, was the owner of the securities held in the custody accounts of San Juan and Stella.
(g) On March T, 1949, Peter Wehrli requested Guaranty Trust to transfer all the cash and securities held in the accounts of San-Juan and Stella to a new account to be opened in the name of “Estate of Charles Wehrli.” The transfers were made and, as we have stated above, the securities were ultimately distributed to the heirs of Charles Wehrli or used in payment of the expenses of administering his estate.
The Second Circuit held and this court thereafter agreed that the equitable or beneficial interest of a nonresident alien' decedent in corporate stock is property, the value of which is to be included in decedent’s gross estate for taxation. Commissioner v. Nevius, 76 F. 2d 109 (1935), cert. denied, 296 U.S. 591; City Bank Farmers Trust Co. v. United States, 137 Ct. Cl. 798, 149 F. Supp. 186 (1957). Also, the Treasury Regulations, beginning with those promulgated pursuant to the Revenue Act of 1924 and continuing to the present time, have provided in substance that there shall be included in the gross estate of the decedent the value of all property in which he has the beneficial ownership.[3] In this case, however, we need not delineate nor discuss the distinction between equitable and legal interests in property. In the words of decedent’s son, who was fully empowered to act for him, no other
*104 person, firm, corporation, or association bad any legal, beneficial, or equitable ownership in the securities which are the subject of this suit.
The decisions of this court in James v. United States, 68 Ct. Cl. 379 (1927), Bickford-Smith, et al. v. United States, 112 Ct. Cl. 144, 80 F. Supp. 660 (1948), and City Bank Farmers Trust Co., supra, which are cited in plaintiff’s brief, do not aid plaintiff’s cause. The facts involved in those cases are in nowise comparable. In each, the decedent had neither possession nor the right to possession of the securities. All of the indicia of ownership were in another person and decedent had no right, present or future, to the return of the securities.
Since we have concluded that the decedent owned and held the securities in issue within the meaning of the applicable statutes, it follows that plaintiff’s petition must be dismissed.
FINDINGS OF FACT
The court having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
The Plaintiff
1. (a) Plaintiff, a citizen of the United States, was granted ancillary letters of administration, to administer the estate of the decedent in New York, on February 9, 1949, by the Surrogate’s Court of New York County.
(b) Plaintiff duly qualified and has at all times since acted as such Ancillary Administrator. This action was brought by him in that capacity.
The Decedent
2. (a) Johann Heinrich Karl Wehrli, also known (and hereinafter referred to) as Charles Wehrli, died intestate in Zurich, Switzerland, on November 2, 1948, at the age of 74.
(b) Charles Wehrli was a Swiss citizen and resident of Zurich, where he owned and operated a bank under the name Johann Wehrli and Company.
3. (a) At times material to this action prior to the death of decedent, Peter Wehrli, son of Charles, was associated *105 with, his father in banking and investments. In 1937, Peter 'Wehrli, then 25 years of age, was living in his father’s home 'in Zurich and working in his father’s bank. Their association in business and investments continued throughout the father’s life.
(b)As early as 1933 (marking Hitler’s rise to power in •Germany), Charles Wehrli began transferring some of his investments out of Switzerland. In 1939, just prior to the outbreak of war in Europe, the process was intensified. By this time (1939), Peter Wehrli was fully authorized to act lor his father in the transactions pertinent to this case.,.
The Liechtenstein Corporations
4. (a) In the mid-1920’s two corporations, each wholly •owned by Charles Wehrli, were organized under the laws, of the Principality of Liechtenstein, each having its seat at Vaduz.
(b) Under the laws of the Principality of Liechtenstein: (1) a corporation is a legal entity, separate and apart from .any individual or individuals owning its stock, and may own :and hold property and incur and discharge debts as such entity ; and (2) under certain circumstances the corporate veil may be pierced to identify individuals involved in corporate transactions or concerned with corporate assets or liabilities.
5. (a) The first of Charles Wehrli’s Liechtenstein corporations was organized on September 22,1925, under the name •of Compagnie Commerciale Continentale, S.A., and is hereinafter referred to as CCC.
(b) The second corporation was organized on March 1, 1926, under the name of Taurus A.G. (sometimes known as Taurus, S.A.) and is hereinafter referred to as Taurus.
(c) From inception until sometime in 1939 or 1940, each (Corporation engaged in the purchase and sale of securities. Funds for this purpose were derived from the capital invested in or loans made to the corporations by Charles Wehrli ■and from advances made by Peter Wehrli, who managed the investments of both corporations during the period 1937-1940.
(d) The activities of both corporations were curtailed, beginning in 1939, and by the end of 1940 both were dormant. *106 The liquidation of both corporations was begun in 1948, prior to the death of Charles Wehrli. Taurus became extinct in 1951 j[1] CCC in 1953.
(e) After 1939, the onfy recorded assets of CCC consisted of approximately 45,000 Swiss francs in cash and some advances to other companies controlled in whole or in part by Charles Wehrli.
(f) After 1940, the only recorded assets of Taurus consisted of a small amount of cash, a small advance to another Liechtenstein corporation, and an advance of some 60,000 Swiss francs to Kumburu, another Liechtenstein corporation wholly owned by Charles Wehrli.
The Argentine Corporations
6. (a) In 1939, two corporations were organized under the laws of Argentina, each having its seat at Buenos Aires.
(b) The first Argentine corporation was organized on February 10, 1939, under the name of Stella S.A. Argentine Commercial Industrial y Financiera, and is hereinafter referred to as Stella.
(c) Stella engaged in the purchase and sale of securities in Buenos Aires, Argentina; Lima, Peru; Montevideo, Uruguay; Caracas, Venezuela; and in London and New York.
(d) The second Argentine corporation was organized on August 21, 1939, under the name of San Juan Sociedad Anónima Commercial Financiera and Industrial, and is hereinafter referred to as San Juan.
(e) San Juan engaged in the purchase and sale of securities in Buenos Aires, Caracas, and New York.
(f) Stella and San Juan were formed and the securities hereinafter listed in Tables 2 and 3 were transferred to accounts in their names because of fear that the German Army might invade Liechtenstein and Switzerland and seize any assets found there.
(g) Stella and San Juan were formed with the assistance of a Mr. Juan Martin, a nephew of decedent, who lived in Buenos Aires and who, with others, acted as nominee for *107 Charles Wehrli, Max Reutter, and Karl Kessler, the three individuals who contributed the original 25 percent of the required share capital of San Juan.
(h) For a period of a few months during 1940, Charles Wehrli was listed as a director by each of the corporations. In each instance, he severed the connection.
Custody Accounts With Guaranty Trust
7. (a) On September 11,1939, San Juan opened and thereafter maintained a securities custody account with the Guaranty Trust Company of New York (hereinafter Guaranty Trust) under a custody agrément made that day. San Juan also opened a cash account with Guaranty Trust.
(b) San Juan designated Peter Wehrli, solely, or Cordova Moyano and Robert J. M. Lagier, signing jointly, as the sole persons whose instructions on behalf of San Juan with respect to said accounts should be recognized and complied with by Guaranty Trust. Their powers included the power to withdraw securities free of payment.
8. (a) On November 16, 1942, Stella opened and thereafter maintained a securities custody account with Guaranty Trust under a custody agreement made that day. Stella also opened a cash account with Guaranty Trust.
(b) Stella designated Peter Wehrli, solely, or Cordova Moyano and Robert J. M. Lagier, signing jointly, as the sole persons whose instructions on behalf of Stella with respect to said accounts should be recognized and complied with by Guaranty Trust. Their powers included the power to withdraw securities free of payment.
Basis of Suit
9. (a) As Ancillary Administrator of decedent’s estate, plaintiff sues to recover the sum of $94,969.12 (with interest on $87,905.25 from May 1, 1950, and on $7,063.85 from December 5, 1952) [2] representing the estate tax that was paid to defendant on the securities listed in Table 1 (incorporated herein by reference), contending that those securi-
*108 ties were not “owned and held” by decedent at the time of his death within the meaning of section 862(a) of the Internal Eevenne Code of 1939.
(b) At the time of decedent’s, death, the securities listed in Table 1 were in the physical possession of Guaranty Trust. The securities listed in Part A (sections 1 and 2) of Table 1 were carried by Guaranty Trust in the custody account maintained by it in the name of San Juan. The securities listed in Part B were carried by Guaranty Trust in the custody account maintained by it in the name of Stella.
Tabee 1*

*109 Liebmaim Breweries, Inc.
10. (a) In May 1936, all of the shares of Liebmaim Breweries, Inc.,[3] were purchased in the name of CCC for $1,282,-922. Payment was made by certified checks drawn on an account of Johann Wehrli & Company, the Swiss banking corporation owned by decedent.
(b) Contributors to the purchase price included the following: $1,000,000 came from a company owned and controlled by Messrs. Bemberg, of Buenos Aires; $100,000 came from Julius and Alfred Liebmann; $83,000 represented funds paid by the sellers as a commission for negotiating the sale (Charles Wehrli being responsible for $21,000 of this amount; $50,000 contributed by Count de Ganay of Paris; and $50,000 contributed by Charles Wehrli (making his total contribution $71,000).
(c) The shares so purchased were deposited by CCC with voting trustees[4] under a voting trust, and voting trust certificates were issued as follows: (1) to CCC, 1,383 shares of Class A Preferred 8%; 2,605 shares of Preferred 6%; and 922 shares of Common; and (2) to each of the Liebmanns, Julius and Alfred, 58% shares of Class A Preferred 8%; 110 shares of Preferred 6%; and 39 shares of Common.
11. (a) On March 24, 1937, the certificate which had been issued to CCC was split up and a new certificate was issued to CCC for 155 shares of Class A Preferred, 293 shares of Preferred, and 104 shares of Common.
(b) At the same time a certificate was issued to the Bem-berg interests for the remaining values of COC’s former certificate, being 1,228 shares of Class A Preferred, 2,312 shares of Preferred, and 818 shares of Common.
12. (a) In 1939, CCC, exercising an option held by it, purchased voting trust certificates representing 13 shares of Class A Preferred, 24 shares of Preferred, and 9 shares of Common, and had them issued to and registered in the name of San Juan.
*110 (b) On June 3, 1940, a voting trust certificate for 155 shares of Class A Preferred, 315 shares of Preferred, and 104 shares of Common, held by CCC was deposited with Guaranty Trust and new voting trust certificates covering said shares were issued to and registered in the name of San Juan, at the request of Messrs. Proskauer, Bose & Paskus, Attorneys at Law, 11 Broadway, New York City.
(c) The evidence does not disclose when or how San Juan acquired the $33,000 principal amount of Liebmann Breweries 6% debentures due February 1, 1960. San Juan did acquire them and had full power over them.[5] Guaranty Trust collected the interest on the debentures for the account of San Juan.
San Juan’s Other Securities
13. (a) In April 1939, Charles Wehrli withdrew from an account maintained by CCC with Johann Wehrli & Cie (his own banking corporation of Zurich, Switzerland) Swiss franc currency notes having a value of $150,000 United States currency and remitted the sum of $150,000 to San Juan for credit to his account.
(b) What relationship, if any, the purchases reflected in Part A-2 of Table 1 had to the $150,000 advance made to San Juan by Charles Wehrli in April 1939 is not disclosed by the evidence.
14. (a) The shares of stock listed in Part A-2 of Table 1 were registered on the books of the various corporations in the name of the nominee of Guaranty Trust and were held by Guaranty Trust in San Juan’s custody account, and were so registered and held on November 2, 1948, the date of decedent’s death. The same was true of the Bepuiblic of Uruguay bonds.
(b) Subject only to the blockage of the account pursuant to wartime regulations,[6] San Juan had complete power to deal with these securities at any time after they were acquired, including the power to sell them, to vote the stock, and to collect the dividends thereon, and to collect the inter *111 est on the bonds. San Juan executed proxies in connection with the voting of the stock and Guaranty Trust collected the dividends on the stock and interest on the bonds for the account of San Juan.'
Raphael & Sons, Taurus, and Stella
15. (a) On August 30, 1938, Peter Wehrli opened two accounts (an ordinary account and a special account) on behalf of and in the name of Taurus with R. Raphael & Sons, members of the London stock exchange.
(b) The ordinary account represented funds of Charles Wehrli, while the special account represented funds of Peter Wehrli. The securities placed in the two accounts are listed in Table 2, incorporated herein. The selections were made by Peter Wehrli, without instructions from his father.
16. (a) On March 22, 1939, pursuant to instructions of Taurus, the foregoing accounts were closed and the securities listed in Table 2, together with Taurus’ cash balances in
Table 2

*112 sterling and dollars, were transferred to accounts (securities' and cash, balances) maintained by R. Raphael & Sons in the-name of Stella. There is no evidence of any valuable consideration passing from Stella to Taurus in the transaction..
(b) On August 81, 1939, R. Raphael & Sons wrote to Stella asking to be advised as to who were the owners of the securities in Stella’s accounts, and stating that if Stella, was holding them for third parties, it would be necessary for Stella to supply the names and addresses of the actual owners. On October 20,1939, Stella replied:
***T¡^re*** herewith confirm that we are the absolute owners of the securities which you are holding-for our account. ■
(c) Between January 31 and May 15, 1940, R. Raphael & Sons, on orders from Stella, sold for Stella’s account the-securities listed in Table 2, and paid the proceeds of such sales to General Merchant Bankers Ltd., 2 Bishopgate, London, for account of an Argentine corporation, Crédito Industrial y Commercial Argentino-, S.A.
Hallgarten & Co., Taurus, CCC, and Stella
>17. (a) On May 1, 1939, Hallgarten & Company,[7] members of the New York Stock Exchange, maintained accounts in the name of Taurus and CCC, and held for them, respectively, the securities and cash listed in Table 3 (incorporated herein).
Table S

*113 (b) On that day, the securities and cash listed in Table 3 were transferred by Hallgarten & Company on its books to ■an account in the name of Stella. The transfer was confirmed by Hallgarten’s letter of May 2,1939, as having been by order of CCC and Taurus.
(c) There is no evidence that a valuable consideration was given by Stella to Taurus or CCC for the securities so transferred.
(d) The securities were first listed in Stella’s records in favor of an account designated Administration Taurus. The designation was later changed to Administración Con-fidencia I, which was a code reference to Charles Wehrli.
Blocked Accounts
18. (a) Executive Order 8389,[8] as amended by Executive Order 8785,[9] prohibited, except as specifically authorized by the Secretary of the Treasury, certain transactions in blocked property therein specified involving property “in which any foreign country designated in this Order or any national thereof has at any time on or since the effective date of this Order had any interest whatsoever, direct or indirect.” The Order designated Liechtenstein and Switzerland and their nationals as being within its coverage.
(b) On April 21,1942, the Secretary of the Treasury issued General Boiling No. 12,[10] which provided:
(1) Unless licensed or otherwise authorized by the Secretary of the Treasury (a) any transfer after the effective date of the Order [Executive Order No. 8389] is null and void to the extent that it is (or was) a transfer of any property in a blocked account at the time of such transfer; and (b) no transfer after the effective date of the Order shall be the basis for the assertion or recognition of any right, remedy, power, or privilege with respect to, or interest in, any property while in a blocked account (irrespective of whether such property was in a blocked account at the time of such transfer).
vP 7T Tv Tv Tv
(5) For the purposes of this general ruling:
% ‡ # }{<
*114 (b)The term “property” includes - * * * * *
securities (as that term is defined in sec.-2(1) of the Securities Act of 1933, as amended).
*****
debts, claims,
*****
and evidences of any of the foregoing.
(c) On October 20, 1943, the Secretary of the Treasury issued General Ruling No. 17,[11] applicable (by section 1) to the purchase and sale of securities and the receipt of dividends, interest, or other income on securities held in any account maintained in the name of any bank or other financial institution located in a blocked country and not licensed as a generally licensed national.
Section 2 of the Ruling provided that no purchase or sale of securities or the receipt of dividends, interest, or other income on securities to which the ruling is applicable may be effected unless the person with whom the account is maintained is in possession of the name, address, and nationality of each person having an interest in the securities on the date when such securities were received into the account or on April 8, 1940, whichever is later, the name, address, and nationality of each person having an interest in the securities on the date when the transaction is effected, and in the case of any proposed purchase of securities, the name, address, and nationality of each person who will have an interest in such securities as a result of the transaction.
(d) In 1945, Guaranty Trust requested of Stella the information called for by General Ruling No. 17. On October 13, 1945, Peter Wehrli wrote a letter on Stella’s letterhead advising Guaranty Trust:
For the purposes of Section 2 of General Ruling No. 17 * * * ap the securities in the * * * account since April 8, 1940, or the date deposited in the account, have been the property of Mr. Charles Wehrli, a citizen of Switzerland * * *.
(e) The securities listed in Part B of Table 1 had not been purchased by Stella at the time of the foregoing letter.[12]
*115 Reports by Price, Waterhouse & Co.
19. (a) On September 8, 1945, Price, Waterhouse & Company, of Zurich, submitted to Johann Wehrli & Cie, a report on an examination of the bank’s accounts for the period from January 1, 1989, to December 31, 1944. The covering letter recited that:
In accordance with your instructions we have made an examination of the books and accounts of your company (hereinafter referred to as the bank) * * *. * * * we were required to investigate * * * the purpose for which the two companies Securitas * * * and San Juan * * *, both of Buenos Aires, were formed.
(b) With respect to Securitas and San Juan, the report stated:
These two companies * * * were formed in Buenos Aires in March 1939 with the assistance of Mr. Juan Enrique Martin, a nephew of Mr. * * * Wehrli, who together with certain officials of the Bemberg organization acted as nominee for Messrs. Wehrli, Reutter and Kessler. * * * The participation of Messrs. Wehrli, Reutter and Kessler in the capital of these two companies is as followsMr. Wehrli 60%, Mr. Reutter and Mr. Kessler each 20 %.
We understand that the two companies * * * were set up in order to hold private funds and securities of Messrs. Wehrli, Reutter and Kessler, and of such of the bank’s customers as might feel some anxiety regarding the safety of their assets in Switzerland under the conditions prevailing in Europe in 1939. * * * The main difference between Securitas and San Juan was that Securi-tas was intended to hold the funds and securities of the bank’s customers * * * whereas San Juan was intended only to hold the personal assets of Messrs. Wehrli, Reutter and Kessler. * * *
V 'fc
As regards San Juan, Messrs. * * * Wehrli, * * * Reutter and * * * Kessler remitted, in April 1939, U. S. $250,000 to this newly formed company, U.S.$150,000 to be credited to the account of Mr. * * * Wehrli (Administration Taurus) and U.S.$50,000 each to be credited to the accounts of Messrs. Reutter (Syndicate Commerz) and Kessler (Syndicate Phoenix) respectively. * * * the amount of U.S.$250,000 * * * on *116 the bank’s instructions was transferred by Guaranty Trust Company, New Tork, to Bankers’ Trust Company, New York, for account of Crédito Industrial e Commercial Argentino * * * Buenos Aires, for credit to the account of San Juan with that bank. * * *
20. (a) On September 8,1945, Price, Waterhouse & Company, of Zurich, submitted another and separate report to Mr. Wehrli, in response to his instructions to extend the review to the activities of certain companies owned by him, among which were CCC and Taurus. The review also covered Stella.
(b) With respect to Stella, the report said:
In as much as the books and records of this company are maintained in Buenos Aires our enquiries into the relationships existing between this company and yourself were entirely confined to such information and supporting evidence as you were in a position to supply us with here in Zurich.
You informed us that such personal notes, correspondence or other data as might then have been available in respect of Stella here in Zurich were destroyed in 1940 in order that no indication of the existence of this company should fall into the hands of the German authorities in the event of an invasion of Switzerland. You explained to us that the company was formed in 1939 with the cooperation of your nephew, Mr. Jean Enrique Martin, from among whose friends, mostly employees of the Bemberg organization, a group of persons was selected to act as stockholders on your behalf. The purpose of Stella was to act as a holding company for certain of your personal investments and funds which, we understand, you had been transferring to South and North America since 1933. * * *
(c) With respect to COO, the report said:
This company was incorporated in Vaduz in 1925 with a_ capital of S. Fes. 100,000.00, divided into 100 nominative shares of S. Fes. 1,000.00 each, registered in the name of Mr. Ernest Eechnitzer, but we understand that the entire share capital of the company was later acquired by yourself. In 1939, the capital was reduced to S. Fes. 20,000.00 by way of a repayment of S. Fes. 800.00 on each share, the total amount of the reduction, i.e. S. Fes. 80,000.00 being credited to one of the various accounts carried on the company’s books and apparently representing a liability towards yourself. At the same *117 time the 100 nominative shares were converted into 100 bearer shares with a nominal value of S. Fes. 200.00 each. You confirmed to us that you are still the beneficial owner of these shares.
The board of the 'C.C.C. at present consists of yourself, your son Mr. Peter Wehrli, and Mr. E. Schmid-Villard, a personal friend.
Our review of the recorded transactions of C.C.C. during the years 1939 to 1944 inclusive showed that the company was practically dormant during this period except for the disposal in 1939 of its participation of 24.94% in the so-called Liebmann Syndicate to San Juan, * * * and of its holding of 20 Cervecería Santa Fe shares to Stella * * *. As regards the Liebmann Syndicate this was holding 155 8% pref. A shares, 293 6% pref. shares' and 104 common shares of Liebmann Breweries Inc., New York.
* * * The only assets of any importance held by C.C.C. at present are the advances to Kumburu and Taurus, Vaduz.
# # sfe sic *
(d) With respect to Taurus, the report said :
The formation of this company took place in 1926. You confirmed to us that you are the beneficial owner of its entire share capital, which was reduced in 1939 from S. Fes. 200,000 to S. Fes. 20,000 by way of a repayment of S. Fes. 900.00 on each of the outstanding 200 shares. * * *
During the period from 1939 to 1944 Taurus, Vaduz would not seem to have effected transactions of any importance; throughout this period the company has been holding as its major asset an advance to Kumburu.
*****
On Releasing Restrictions
21. (a) On May 7,1948, the Federal Reserve Bank of New York, by direction and on behalf of the Secretary of the Treasury, issued a license[13] to Alfred L. Rose, one of the voting trustees of Liebmann Breweries, Inc., licensing the termination of the voting trust agreement, authorizing the transfer of the underlying securities to the names of the persons entitled to receive them, and further authorizing the delivery of the underlying securities standing in the *118 name of San Juan to Guaranty Trust for deposit in an account with Guaranty Trust which was regarded as blocked under the Proviso of Paragraph (1) of General License No. 94 against the surrender of the appropriate voting trust certificates.
(b) By a declaration executed as of May 12, 1948, the voting trust agreement[14] was declared terminated by the voting trustees, and Guaranty Trust, as agent, was authorized to deliver the underlying shares to the persons entitled to receive them upon surrender of their outstanding voting trust certificates.
(c) On July 15,1948, there were registered in the name of San Juan on the books of Liebmann Breweries, Inc., 152 shares of the Class A Preferred stock, 306 shares of the Preferred stock, and 102 shares of the Common stock of Lieb-mann Breweries, Inc., and certificates therefor were issued in the name of San Juan and delivered to Guaranty Trust.
22. (a) On June 7, 1948, Peter Wehrli wrote to Messrs. Katz and Sommerich, of New York (plaintiff’s law firm) :
I hereby retain you, as the attorneys for Charles Wehrli (my father) and myself, to take such steps and proceedings as you may deem necessary to procure the release of our respective moneys, securities and/or other property now blocked in the United States, consisting particularly of cash and securities held by Securitas * * * San Juan * * *, and Stella * * * all of Buenos Aires, in accounts with Guaranty Trust * * * of which my father and I are the sole legal and beneficial owners, and in which assets no other person, firm, corporation or association has any legal, beneficial or equitable ownership whatsoever, to apply to the United States Treasury Department (Foreign Funds Control Division), and/or the Office of Alien Property, Department of Justice, and/or any other governmental agency having jurisdiction in the matter, for a release * * *.
(b) On June 9, 1948, Peter Wehrli wrote to Guaranty Trust:
In accordance with my cable instructions of January 23, 1948, you purchased for the account of San Juan * * * $70,000. par value Uruguay Bonds 1079 and identified these Bonds for the purposes of General Ruling No. 17 as my property.
*119 The designation of my name with the name of San Juan * * * is simply part of the signature to the cable, and was not intended to record the Bonds as my property. Actually they are the property of Mr. Charles Wehrli, and I would appreciate it if you would make the necessary adjustments in your records.
(c) On July 1, 1948, Henry I. Fillman[15] wrote to the Office of Alien Property, “* * * advising * * * of the assets owned by Chaiies Wehrli and Peter Wehrli, respectively, and held for them by the companies hereinafter specifically mentioned.”
Listed under the name of Stella, as “assets owned by Charles Wehrli,” were 300 shares of liumbie Oil, 1,400 shares of Sinclair Oil, 300 shares of International Nickel of Canada, and $34,000 Eepublic of Uruguay bonds, 4%%.[16]
Listed under the name of San Juan, as “assets owned by Charles Wehrli,” were substantially the same securities as are listed in Table 1, Part A, sections 1 and 2.
(d) Mr. Fillmairs letter to the Office of Alien Property stated:
All of the foregoing assets are held in accounts with the Guaranty Trust * * *
It may well be that there will be changes in the cash amounts by reason of the payment of dividends or interest on the securities held in the securities accounts, but such changes are of no great significance in connection with the disposition of the matter.
* * * I am at the moment confining myself to the Liebmann Breweries, Inc. stock listed above and owned by Charles and Peter Wehrli, respectively, for the reason that, in my opinion, said shares of stock can properly be released from all control, to the end that the certificates representing said shares be unblocked by proper license or release.
* * * Proskauer Pose Goetz & Mendelsohn represented the purchaser, Compagnie Commerciale Conti- *120 nentale S.A., which, acted as a nominee for the individuals, among whom were Charles Wehrli and Peter Wehrli, in the purchase of the stock. * * * I am sure-that an examination of the papers * * * will impel you to the conclusion that the shares of Liebmann Breweries,, Inc. stock owned by Charles and Peter Wehrli should be’ released to their free use and disposition.
‡ ‡ *
23. (a) On January 26, 1949, plaintiff filed an application [17] for authorization to Guaranty Trust to unblock the-securities maintained in custody accounts in the names of Stella and San Juan. The application stated, in part:
* * * B. The applicant desiresa license in ordet to * * * authorize Guaranty Trust Company of New York * * * to regard the following property as prop erty in which no blocked national, under Executive Or der No. 3839, as amended, has or has had any interest.
The securities were described as “assets owned by Charles. Wehrli.”
(b) On April 19,1949, the application was granted, and a license was issued which stated:
The Guaranty Trust Company of New York * * * is-hereby licensed to regard the property listed below, as property in which no blocked country or national thereof has, or has had, any interest. * * *
Listed were (1) the securities listed in Table 1, Part B, to which was appended the notation: “together with any funds derived therefrom, held by Stella * * *”; and (2) the securities listed in Table 1, Part A, sections 1 and 2, to which was appended the notation: “together with any funds derived therefrom, held by San Juan * * * all beneficially-owned by Charles Wehrli.”
Swiss Inventory
24. (a) On November 13, 1948, Peter Wehrli wrote to Guaranty Trust:
I am very sorry to inform you that my father, Mr. Charles Wehrli, died on November 2nd, 1948.
For the liquidation of the estate tax in Switzerland *121 I would greatly appreciate your forwarding as soon as possible statements showing all the securities belonging to my father and deposited in the accounts of San Juan-S.A. and Stella S. A.
Would you please set up the statements in exactly the' same manner as the last ones which you handed to me in June or July of this year, i.e. it should be stated that the securities are Mr. Charles Wehrli’s property.
(b) In connection with the settlement of decedent’s estate,, an inventory was prepared for Swiss tax purposes, as required by law, listing all of decedent’s assets as of the date-of his death. The Swiss tax authorities discussed with Peter Wehrli the assets to be included in this inventory.
(c) The inventory included the securities held in the-accounts of Guaranty Trust which are in issue here. It also-included the income of Charles Wehrli in 1947 subject to* Swiss tax, within which was listed the income from dividends and interest paid in 1947 on the securities in the Guaranty Trust accounts.
(d) The Swiss inventory did not list among decedent’s; assets, or as part of his 1947 income, either stock or dividends of CCC or Taurus, although 21 companies of which-Charles Wehrli was a director were listed.
(e) The securities which are in issue here were carried on the books of Stella and San Juan in accounts entitled “Depositors of Securities for Safekeeping, Administración Confidencia I.” Stella and San Juan so certified the assets to the Swiss tax expert representing the estate, and referred to the Liebmann Breweries shares as “Syndicate Liebmann.’^
Guaranty Trust Inventory
25. A Statement of Securities Held, prepared by Guaranty Trust as of the close of business on November 17,1948, listed (1) “San Juan * * * Account owner Mr. Charles Wehrli” and (2) “Stella * * * Acct. owner Charles Wehrli.”
Securities listed by Guaranty Trust as being held in the-account of San Juan were the same as those listed in Table-1, Part A, sections 1 and 2, except that Guaranty Trust listed 205 shares of Standard Oil, where Table 1 shows 210 shares.
Securities listed by Guaranty Trust as being held in the *122 account of Stella were the same as those listed in Table 1, Part B, except that Guaranty Trust listed 300 shares of Humble Oil, where Table 1 shows 400 shares.
The Estate Tax
26. (a) On or about December 22, 1948, Guaranty Trust filed with the Internal Revenue Service an Estate Tax Preliminary Notice[18] relating to the securities inventoried by it as set forth in the preceding finding. These securities were listed as securities “* * * which were identified as being the property of Charles Wehrli * *
(b) On March T, 1949, Peter Wehrli wrote to Guaranty Trust:
Col. Fillman has informed me that considerable progress has been made for the release of the property belonging to the Estate of Charles Wehrli and myself and that he is expecting a final disposition of this matter in the near future. Would it be possible for you to transfer the funds which belonged to my late father to an account in the name of “Estate of Charles Wehrli” if I gave you instructions to this effect on behalf of San Juan S.A. ? Later on the funds would be taken out of this new account and distributed to my father’s heirs as soon as the tax matter has been settled and Col. Fillman who has been appointed administrator is in a position to give the necessary instructions. I realize of course, that a transfer to an account in the name of “Estate of Charles Wehrli” would only be possible after the funds have been deblocked.
(c) On February 15, 1950, Peter Wehrli wrote to Guaranty Trust:
I hereby request you to kindly transfer the following cash and securities from the account of San Juan 8.A. Comercial Financiera e Industrial, Buenos Aires, to a new account to be opened in the name of
Estate of Charles Wehrli:
(Cash and securities listed)
I also request you to transfer the following cash and securities from the account of Stella 8.A. Argentina Comercial Industrial y Financiera, Buenos Aires, to *123 the new account in the name of Estate of Charles Wehrli:
(Custody cash and securities listed)
(d) The accounts which had formerly been listed in the names of Stella and San Juan were transferred to accounts in the name of Estate of Chales Wehrli, and the securities and cash in such accounts were ultimately distributed, either to the heirs of Charles Wehrli, or by use in payment of administration expenses.
27. (a) On May 1, 1950, plaintiff, as Ancillary Administrator, executed and filed with the Collector of Internal Revenue[19] Form 706NA, being the Non-resident Alien Estate Tax Return, and paid the amount of $86,606.16, representing the tax shown on the return as due,[20] and interest thereon in the amount of $1,299.09.
(b) On or about November 14, 1952, the Collector of Internal Revenue corrected the total value of the securities listed on the return, and assessed a deficiency estate tax in the sum of $6,030.65.
(c) On December 5, 1952, payment was made of the $6,030.65, together with interest in the amount of $1,033.22.
28. (a) On April 29, 1953, plaintiff, as Ancillary Administrator, timely filed with the Collector of Internal Revenue [21] a claim for the refund[22] of United States estate tax in the sum of $94,969.12, with interest on $87,905.25 from May 1, 1950, and on $7,063.87 from December 5,1952.
(b) On January 14, 1957, the District Director of Internal Revenue, by direction of the Commissioner of Internal Revenue, forwarded to plaintiff by registered mail a notice disallowing the claim for refund in its entirety.[23]
Conclusion
29. (a) The securities here in issue, in the accounts with Guaranty Trust in the names of Stella and San Juan, were, *124 at the time of decedent’s death, held 'by these firms as custodians for decedent, Charles Wehrli, who was the owner of the securities.
(b) The evidence will not support findings, as requested by plaintiff, that at the time of decedent’s death: (1) Taurus had a claim against Stella by reason of the transfer of securities and cash balances from Taurus to Stella; or (2) CCC had claims against Stella and San Juan by reason of transfers of securities and cash from CCC to Stella and San Juan; or (3) decedent had claims against Taurus or CCC which were related to the securities in issue.
CONCLUSION ON LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and his petition is therefore dismissed.

 In general, these sections of the 1939 Code provide that there Is Includible in the estate of an alien decedent and subject to the estate tax, all of his Interest in any property that Is situated in the United States at the time of his death.

 Section 862(a), which relates only to stock in domestic corporations and, therefore, is not applicable to many of the securities in issue, provides:
“For the purpose of this subehapter—
“(a) Stock in domestic corporation. — Stock in a domestic corporation owned and held by a nonresident not a citizen of the united States shall be deemed property within the- United States; * *

 See Article 10 of Treasury Regulations 68, promulgated under the Revenue Act of 1924, ch. 234, 43 Stat. 253 ; Article 10 of Treasury Regulations 70, promulgated under the Revenue Act of 1926, ch. 27, 44 Stat. 9; Article 10 of Treasury Regulations 80 (1934 ed.), promulgated under the Revenue Act of 1926 as amended and supplemented by the Revenue Acts of 1928, ch. 852, 45 Stat. 791, 1932, ch. 209, 47 Stat. 169, and 1934, ch. 277, 48 Stat. 680; Article 13 of Treasury Regulations 80 (1937 ed.) ; Section 81.13 of Treasury Regulations 105, promulgated under the 1939 Internal Revenue Code; Section 20.2033 — 1 of the Treasury Regulations on Estate Taxes, promulgated undér the 1954 Internal Revenue Code.

 On May 4, 1848, Charles Wehrli and Peter Wehrli were discharged as members of the Management Council of Taurus.

 The parties Rave agreed that if plaintiff is entitled as a matter of law to recover, the amount of the recovery is to be determined in further proceedings..

Table 1 refers to finding 9(a) on page 107.

 Consisting of three classes of stock: Class A Preferred 8% ; Preferred 6% ; and Common. Transactions recited In evidence account for a total of 1,GOO shares of Class A Preferred, 2,825 shares of Preferred, and 1,000 shares of Common.

 The voting trustees were Otto 35. Bemberg, Alfred Pestalozzi, Alfred L. Rose, and Peter Wehrli.

 Subject only to restrictions resulting from tbe blocking of the account pursuant to wartime regulations.

 See findings 18 and 21-28.

 44 Pine Street, New York.

 Issued April 10, 1940, 5 F.R. 1400.

 Issued June 14,1941, 6 F.R. 2897.

 7 F.R. 2991.

 8 E.R. 14341.

 Those securities were purchased in 1948. Table 1, Part B.

 License No. N.Y. S52893-B.

 TMs agreement, of May 31, 1946, had been extended to May 31, 1951.

Mr. Fillman, as plaintiff, Is the Ancillary Administrator. He was then counsel for the Wehrlls.

 Reference to Part B of Table 1 shows that of these securities, only Uruguay bonds were on hand as of July 1, 1948. ¡Except for such bonds, the securities listed In Stella’s custody account as of the date of decedent’s death were all acquired after July 1, 1948.

 On Treasury Department Form TF-1.

 Treasury Department Form 705.

 For the Second District of New York.

 Items 1-13, Inclusive, of Schedule A of the return listed the securities shown on Table 1, together with a stock dividend declared on the Standard Oil shares, and showed a total value on November 2, 1948, of $546.693.90.

 Lower Manhattan District, New York.

 Said claim for refund was a valid, formal, written claim on Form 843 pre-•scrlbed by the Treasury Department, and was duly and timely filed.

 This action was in conformity with Section 3772(a)(2) of the Internal Revenue Code of 1939.